OPINION
Defendant-appellant St. Gobain/Norton Industrial Ceramics Corporation ("St. Gobain"), a French corporation headquartered in Paris, appeals from a three-week trial and jury verdict in favor of plaintiffs-appellees on their gender-based discrimination claims in violation of R.C. 4112, et seq., and the award of attorney fees and prejudgment interest.[1] For the reasons adduced below, we reverse.
A review of the Homeric record on appeal indicates the identities and employment information of female plaintiffs-appellees, and the substance of their discrimination claims arising from their August 15, 1995 reduction-in-force ("RIF") termination at appellant's Newbury, Ohio, operations of its affiliate, Bicron Industries ("Bicron")[2]:
 1. Wilma Joiner, Traffic Manager at Newbury, Ohio, age 51, 10 years of service with annual salary of $34,008, pay discrimination;
 2. Randi Deluga, Cost Accountant at Newbury, Ohio, age 36, 7 years of service with annual salary of $35,064, pay discrimination;
 3. Marina Gliner, Product Engineer at Newbury, Ohio, age 35, 5 years of service with annual salary of $38,400, pay and termination discrimination; and,
 4. Betty Nowac, Accounting Manager at Newbury, Ohio, age 45, 7 years of service with annual salary of $47,988, pay and termination discrimination.
A total of twenty-three employees, including the plaintiffs-appellees herein, from Bicron's Newbury and Solon operations were terminated in the RIP. The RIF was spread over all sectors of the Bicron operations of these twenty-three individuals, twenty were classified as "exempt," or salaried employees and three were classified as "non-exempt," or clerical hourly employees. Plaintiffs-appellees were all "exempt" employees. Two of the twenty-three were supervisors and seven were managers. of the twenty-three let go by Bicron, sixteen were men and seven were women. Four of the twenty-three, all men age sixty and older with in excess of twenty years of service at the company, negotiated retirement with Bicron as part of the RIF. The years of service within the group of twenty-three ranged from one year to twenty-eight years with the following numbers of employees representing different ranges within the years of service:
 1. 0-5 years of service --- 7 employees (five males, two :[emales);
 2. 6-10 years of service --- 6 employees (two males, four females)
 3. 11-15 years of service --- 4 employees (three males, one female)
4. 16-20 years of service --- 1 employee (male);
 5. 21-25 years of service --- 4 employees (all males);
 6. 26-30 years of service --- 1 employee (male). See Defendant's Exhibit A.
Note, three of the plaintiffs-appellees (Deluga, Joiner and Nowak) are part of the second subset in the preceding years-of-service chart while one (Gliner) is in the first subset.
At the trial, plaintiffs presented the testimony of twenty-one witnesses. The first witness for the plaintiffs was Dr. Robert Battisti, a non-clinical psychologist who counseled Maria Gliner beginning in September of 1995 (about one month following her termination). Dr. Battisti related that Gliner, an assertive person who persists in asking questions, allegedly first suspected gender discrimination in 1994 and that she received a poor performance review in 1995. Gliner told him that she feared for her job starting in early 1995 based on several comments made by her supervisor, Mr. Kosuth, and the fact that a new (male) engineer, Mr. Herr, was hired in her department. Gliner was concerned that the new hire made her department overstaffed and she also took offense when Bicron purchased a new computer for Mr. Herr, but declined for budgetary reasons to give her a new computer when she complained. Gliner also feared for her job because she suspected the company would not look kindly on her decision to pursue fertility enhancing procedures which would necessitate time away from work, and would also adversely affect her continued employment if she became pregnant and had to miss work for extended periods or the pregnancy/parentage might impinge her ability to travel as part of her job duties.[3] The results of her October 23, 1995 Minnesota Multiphasic Personality Inventory test and the problems she related that she was experiencing, indicated that Gliner was in a state of depression. Dr. Battisti opined that this depression, which he considered to be permanent in nature, was a direct result of the gender discrimination Gliner was subjected to at Bicron. (R. 193-194.) The doctor admitted that he did no independent investigation to learn the truth or falsity of Gliner's allegations; he took her word for it. (R. 199.) Also, Dr. Battisti stated that he performed no further tests on Gliner after October 1995, and that it is not unusual that simply losing one's job would cause a major reaction in emotional problems. (R. 209-210.)
The second witness for plaintiffs was Mr. Steven R. Willing, who was called as if on cross-examination. Willing stated that in 1989 he was employed as a cost accountant, supervising three to four people at Thermal American Fused Quartz, a subsidiary company of St. Gobain. Willing testified that the product lines of Bicron and Thermal American Fused Quartz are different and that he was, through the assistance of his supervisor (Ms. Pam Sheehan) offered a position at Bicron's Solon operation in January of 1992 as part of a lateral transfer because Thermal American, which was located in the State of Delaware, was scheduled to close in June of 1992. Willing's title at the Solon operation was as senior accountant where he supervised no one when he arrived and his starting annual salary was $47,330 (which represented an increase in salary from $43,400). His office location shifted to the Newbury plant in 1993 and his title was revised to accounting manager (the same title as Ms. Nowac). Through annual raises of approximately 5%, his 1996 salary reflects that he is paid $56,246. Despite the same job titles of accounting managers, he and Ms. Nowac performed different responsibilities in that he did some cost accounting while Ms. Nowac was doing more general accounting duties. (R. 252.) While he would often go to lunch with the accounting supervisor, Mr. Mikolic, whose office was next to his, Willing could not remember a time when Ms. Nowac was invited to lunch with them. Business affecting Willing's responsibilities would often be discussed at these lunches and Mikolic, whom Willing thought treated he and Nowac similarly in terms of management, never discussed Ms. Nowac with Willing.
The third witness for the plaintiffs was Dr. Harvey Rosen, an economist at the Cleveland, Ohio, firm of Burke, Rosen 
Associates. His evaluation of the plaintiffs' financial status and employment status of similarly situated employees at Bicron indicated that the pattern of terminations at Bicron in the summer of 1995 was not gender neutral. Dr. Rosen's statistical analysis indicated that women at Bicron in the exempt group of employees were three to four times more likely to be selected for layoff as compared to exempt male employees. (R. 292-293.) This statistical result held true even when the witness included the three exempt employees who opted for retirement. (R. 297.) Dr. Rosen also computed Gliner's present value economic loss due to pay inequity at Bicron and the termination to be $231,525. (R. 325.) Dr. Rosen computed Nowac's present value economic loss due to pay inequity at Bicron and the termination to be $234,631 (when comparing her position and salary package against Mr. Willing's). (R. 337-338.) Deluga's present value economic loss was calculated to be between $101,442(when comparing her position and salary package inequities against Mr. Weaver's) and $127,729 (when comparing her position and salary package inequities against Mr. Luther's). (R. 345-346.) Joiner's present value economic loss was calculated to be $171,302 (when comparing her position and salary package inequities against Mr. Hayhurst [a subordinate who worked for Joiner]). (R. 352-353, 397.) Dr. Rosen was not provided information on Bicron's nonexempt work force and did not use non-exempt employees in his computations; he used only exempt employees in his analyzed pool because the plaintiffs were exempt employees. On cross-examination, Dr. Rosen admitted that: he did not utilize any documents prepared by Bicron management personnel in anticipation/planning of the RIF as to which employees would be potentially included as part of the downsizing; he did not look at any work experience of the exempt employees prior to their coming to Bicron to possibly explain inequities in pay between employees at Bicron; he divided his analyzed pool into three categories for seniority purposes at Bicron (0 to 10 years of service, 11 to 20 years of service, and more than 21 years of service)[4] in his report from the 1995 RIF and the analysis of economic loss of the plaintiffs he offered no opinion on the validity of the plaintiffs' claim for discriminatory pay (R. 366); he is not offering an opinion whether the employees he used as comparable were, in fact, comparable (R. 367). instead he was asked by plaintiffs' counsel to assume that there were comparable employees for certain plaintiffs (R. 366); plaintiffs' counsel, without giving a reason for performing this function, asked him to make the pay calculations between the plaintiffs and their comparable employee (whose identity was also given by plaintiffs counsel; counsel told him that the evidence would support an appropriate comparison for the use of the person chosen as the comparable employee) on the difference between their salaries (R. 376); he does not offer an opinion on what an appropriate salary for plaintiffs should have been at Bicron (R. 376-377, 379-380, 383); he charges $300 per hour for his services (in and out of court) on top of several thousand dollars for each of the plaintiffs' earning reports (R. 377-378). On redirect examination, Dr. Rosen testified that he was not asked to give an opinion on whether the pay differential between the plaintiffs and their male counterparts were a result of gender discrimination; he simply made a calculation of the difference in salaries and fringe benefits between the plaintiffs and their counterparts. (R. 379.) Dr. Rosen also admitted that the seniority factor could change his calculations in determining whether the RIF was gender neutral. (R. 381-382.) Also, Dr. Rosen stated that the exempt pool of employees prior to the 1995 RIP was 128 exempt employees, of which 112(or 88%) were male and 16 (or 12%) were female. (R. 397-398.) In the RIF, of those exempt employees terminated 68% were males and 32% were females. (R. 398.)
The fourth witness for the plaintiffs, as if on cross-examination, was Mr. Edward Kaufman, who was employed in 1995 at Bicron as Director of Human Resources Administration Environmental Safety and Security. Mr. Kaufman, sometime in early 1995, was aware of some of the discussions concerning a possible RIP by management in 1995, but not all of them. The witness was not aware in early 1995 that a definite decision had been made to effect the RIP. He was not outraged or indignant concerning the idea of a RIP, just concerned about people losing their jobs and wanted to explore all the alternatives before deciding on a RIP as a last resort measure. He denied telling anyone that he believed that possible gender discrimination by management was a motivating factor in who was placed on the termination list. He did not become aware of the fact that a RIP would actually occur until approximately two to three weeks prior to the date of the RIF (August 15, 1995). Early in 1995 when he first heard discussions of a possible RIF, he was of the opinion at that time that such a drastic measure was not needed on the grounds of economic necessity because he thought that the predictions of adverse economic conditions for the company just reflected an ordinary business cycle. (R. 423-424.) He did not believe that female employees at Bicron were being disadvantaged by the management of Bicron in the decisions of who was placed in a particular job. (R. 427.) He was aware that Nowac had complained that her subordinate, Deluga, was under compensated, but the witness did not share Nowac's opinion by Nowac. The witness admitted to cautioning the department heads of Bicron not to run advertisements after the RIF to fill positions of the people who had just been terminated, but he had no recollection of such advertisements, in fact, being run. (R. 431-432.) He thought the downsizing should not have taken place because he did not want people losing their jobs. (R. 434.) He left Bicron prior to the RIP, but returned to perform the RIP. (R. 437.) He did not believe that the RIP was overly weighted against female employees.
The fifth witness for plaintiffs was Mr. Robert Cohn, by way of videotaped deposition. (R. 444.) During the videotaped testimony Cohn stated that he met with Kaufman on October 6, 1995, several months after the RIP had taken place. At that time Cohn was the plaintiffs' counsel[5]. Kaufman allegedly told Cohn that: he was outraged by the RIP and the manner in which some of the employees were chosen to be terminated; it did not make sense to him that management would terminate Gliner but retain Mr. Herr; he expressed his opinion to Mr. Corvo, Gliner's and Herr's supervisor that gender may have played a role in the decision to terminate Gliner rather than Herr; he expressed his concerns to Quackenbush relative to the issue of gender discrimination during the decision making process in planning for the RIP; he spoke with Joiner's supervisor in accounting, Mr. Kaczorowski, and questioned why Joiner would be terminated rather than Mr. Willing, but that he received no good explanation except that economic necessity was the reason; he referred to the management culture as an old boy's club; some department heads expressed concern that the financial crisis put at risk their year-end annual bonuses and that this desire for bonuses motivated Quackenbush and some of the department heads to opt for a RIP so as to ensure those bonuses; he was opposed to the idea of a RIP because he believed that the cyclical financial nature of the company would ultimately reverse, thus the company could get along without the need for terminating a group of employees; he believed that the costs associated with severance packages for those terminated would offset the short-term savings caused by eliminating the salaries of those terminated.
The sixth witness for the plaintiffs, as if on cross-examination, was Mr. Phillip Corvo, who came to Bicron in December of 1993 and is its General Manager for Scintillation Products, reporting directly to the General Manager of Bicron, defendant Carr L. Quackenbush.[6] Mr. Corvo explained the company's organizational chart of the management and departments as of late 1993. Although the witness met Mr. Herr prior to Herr being hired at Bicron, the witness did not set Herr's salary; the salary decision was approved by the General Manager based on the company's haypoint system.[7]
The witness admittedly had a role in the discussions leading to the RIP, making recommendations affecting the employees who were in his department and reporting to him, but the ultimate decision of which employee would be terminated was the sole responsibility of the General Manager. (R. 473.) It was his experience and opinion that females make better production managers than males because females, in his view, are more reliant on their entrepreneurial individual skills which allow them to more easily and successfully interact with multiple, and different, departments within the company in developing a product line. (R. 476-477.) The witness stated that production managers generally do not have supervision responsibility over other people. It was his belief that in the field of production management, women are more articulate than men and also have better perception and take a wider view than men who tend to think in a straight line. (R. 480-481.) Mr. Corvo also agreed with plaintiffs' counsel's belief that the field of engineering is a male-dominated profession and that it would therefore be the exception to find a female as a production engineer. (R. 483-484.) He did not recommend that Gliner be fired simply because she was a female engineer; his views regarding females in the area of production management did not apply to engineers in general. (R. 485.)
The seventh witness for plaintiffs was Mr. Phillip Parkhurst[8], who was originally a Sales Manager for Scintillation Products when he began his employment at Bicron in 1983 and the Vice President of Sales and marketing when he voluntarily left Bicron at the end of 1992. As the time he left Bicron, one of his responsibilities was to manage the Applications Group which consisted of a group of scientific engineers who developed technology, applied technology, and solved technical problems for specific customers on the production lines. Gliner was not a member of the Applications Group, but was a member of the Gamma Camera production team. Gamma Camera accounted for approximately 50% of Bicron's total sales. The witness thought Gliner's work was competent and professional and that she was a superior, motivated performer. (R. 493.) During his last few years at Bicron, there were problems with the Gamma Camera line at the Newbury plant relative to a design/component provided by a customer (Siemens). It was his experience while at Bicron that sales and profits were cyclical and that future sales could be forecasted with some accuracy by looking at the orders received. During senior staff management meetings, the Human Resources Department manager, Donna Lashchuk, voiced her opinion that females and minorities were not adequately represented in management positions. (R. 502-503.) The witness could not recall any females who were a part of the St. Gobain Management Incentive Program during his tenure at Bicron. (R. 504.) Management at Bicron was interested in addressing reported problems, except that the witness was of the opinion that the company took less interest in addressing equal opportunity issues regarding females and minorities. (R. 505-506.) The witness also had contact with Joiner and Nowac and found them both to be competent and professional. He considered Nowac, Gliner and Joiner to be assertive and direct, more so when dealing with male employees than with female employees. (R. 509.) On cross-examination, the witness admitted that he had no knowledge concerning Bicron's financial, business or management affairs, the Gamma Camera team, personnel management policies, the RIP, or the work performance of the plaintiffs after he left the company. In short, once he left Bicron in late 1992, the witness had no personal information concerning any of Bicron's internal affairs. The witness also admitted that St. Gobain, when it acquired Bicron, purchased the witness's ownership stock in Bicron for the sum of approximately $250,000. In the sale of this stock, the witness signed an agreement with St. Gobain containing a non-competition clause and a confidentiality clause. Subsequent to that agreement, after the witness left Bicron's employment, the witness went to work with a competitor of Bicron's. Bicron filed suit to enforce the non-compete agreement and received a judgment in its favor, obtaining injunctive relief which ordered the witness not to compete with Bicron. (R. 517-519.) Dr. Quackenbush testified in the Bicron lawsuit against the witness.
The eighth witness for the plaintiffs was Mr. Wesley Brown, who was employed at the time of trial by Locktite Corporation. The witness was one of the Bicron employees terminated on August 15, 1995 as part of the RIP after two years and eight months of employment with Bicron as Materials Manager.[9] Prior to Bicron, the witness was employed by St. Gobain since 1981. The witness developed the Traffic Manager position (held by Joiner starting in January of 1994) in mid-1993, but he did not evaltiate or assign the haypoint number of 366 to the position. He considered Joiner to be fully competent in performing her job. Joiner's haypoint was 268 in 1995 and 366 in 1994, yet he had no explanation for the ninety-eight-point decline in one year ending with the RIP since there were no changes to his knowledge in the job description or duties. (R. 541.) Even at a haypoint of 366, Joiner's salary was below the minimum salary called for at that haypoint number salary range. (R. 544-545.) He did not think Joiner was being appropriately compensated even after Bicron adjusted her salary to be greater than her subordinate, which then put her into the lower range available for the salary represented by her haypoint. Over the objection of the defense, the witness testified to a conversation he had with Mr. Kaufman subsequent to the RIP at a local restaurant during which Kaufman allegedly stated that the RIP was planned, and lists of potential employees to be terminated drawn up, in early 1995. It was the opinion of this witness that the annual financial fortunes of Bicron could not be predicted as early as February in a particular year. (R. 553-554.) While at Bicron, he was not aware of any economic necessity to justify a RIP. (R. 556-557.) Mr. Kaufman expressed to him the concern of Kaufman that the RIP, in the way it was being planned, would prove actionable for gender discrimination. (R. 560.) The witness admitted to not being an expert on the haypoint system used by Bicron and that a position's haypoint was set at a St. Gobain operation located in Massachusetts, not by Bicron. (R. 567-569.) The witness's sole source of knowledge that Joiner's haypoint number changed was from the chart that plaintiffs' counsel showed him during his testimony that morning; he had not seen that information prior to testifying and had no personal knowledge that anyone's haypoint at Bicron was changed in 1995. (R. 569-574.) In January of 1994, Joiner received a 25% pay increase (from $24,520 per year to $30,000 per year) because the Human Resources Department at Bicron was concerned that Joiner's subordinate (Mr. Hayhurst) was being paid slightly more than Joiner. In 1995 Joiner's annual salary was increased another 13% to a new level of $34,000. (R. 580.) The witness did recall other instances at Bicron involving males where a subordinate was paid more than the supervisor. On re-direct examination, the witness stated that despite the salary increases, Joiner's pay never reached the mid-point of the salary range available for her haypoint and that it was his opinion that she was underpaid in relation to the responsibilities of her position. (R. 585.) Mr. Joiner, on re-cross examination, admitted that he never worked in Human Relations and that he did not know what employees outside his department were paid.
The ninth witness for plaintiffs, as if on cross-examination, was Mr. Hacy Green, who has been employed by St. Gobain since 1976. In March of 1990, Green was transferred from West Virginia to Bicron's Newbury operations as Controller. (R. 590.) In July of 1994 he took on the added responsibilities of the position of Manufacturing Manager of the Organics Production Group at Bicron. Nowac reported to him as Controller and he reported to the International Controller, Mr. Kaczorowski, who in turn reported to Bicron's General Manager. In 1993 the Bicron management merged the Newbury and Solon operations. (R. 593.) Prior to the merger of the operations, Mr. Willing was the Accounting Manager at the Solon plant while Nowac was the Accounting Manager at the Newbury plant. With the merger, Mr. Willing now reported to the witness. In 1990 through 1992, the witness gave Nowac an above-average to exceptional job performance review. (R. 604-607.) In January of 1993, he became concerned about a salary inequity between Nowac and Willing and expressed his concerns to Mr. Kaczorowski; Willing's position was paid 15% greater than Nowac's position despite the responsibilities being virtually the same. (R. 611-613.) Willing had an MBA degree, but Nowac was more familiar with Bicron's accounting procedures in 1993. The witness recommended that Nowac receive an 8% increase in pay rather than the customary Bicron policy of a maximum 5% increase for employees in 1993. This 3% net increase, being not budgeted by the company in excess of the normal maximum of 5%, was disapproved by the company. The witness offered to take the 3% net increase for Joiner out of the witness's scheduled salary increase. In the end, Joiner did receive a 7% increase in salary in 1993. (R. 622-623.) The difference between Willing's and Nowac's salaries in 1993 was approximately $6,000, and in 1994 approximately $5,300. (R. 625.) The witness believed that the pay difference between Nowac and Willing was contrary to his understanding of Bicron's policy of equal pay treatment for equal work. (R. 632.)
The tenth witness for the plaintiffs, as if on cross-examination, was Ms. Sharon Genske. From 1988 to the time of the 1995 RIP, she worked in Bicron's Newbury accounting department and reported to Nowac. (R. 635.) When Willing was transferred to the Newbury plant from the Solon plant, he was given an office in the executive office section despite there being space available in the accounting area where Nowac was located. The executive offices have nicer furnishings than the accounting area. (R. 637-638.)
The eleventh witness for plaintiffs, as if on cross-examination, was Mr. George Luther. He had worked for Bicron or its predecessors for twenty-seven years in the areas of cost accounting, economic management and financial reporting to the United States corporate headquarters in Valley Forge, Pennsylvania. He graduated from high school in 1959 and graduated from college with a degree in accounting/finance in 1985. In the 1970's his salary was approximately $15,000. (R. 647.) In 1995 his salary was approximately $45,000-$46,000. He recalled that Deluga was also a cost accountant at Bicron.
The twelfth witness for the plaintiffs, as if on cross-examination, was Mr. Thomas Hayhurst. At the time of trial, he had worked for Bicron or its predecessors for eighteen years in the shipping and receiving areas. (R. 652.) When asked once by Wes Brown to consider taking the Traffic Manager position in the mid-1990's, he turned the position down because he was comfortable in his current position, that it was more responsibility and pressure than he wanted to assume. (R. 654-655.) At some point, whether she was interviewed for the Traffic Manager position before or after he refused the offer, the Traffic Manager position was given to Joiner.[10] The witness then reported to Joiner. It was the witness's opinion that Joiner was a nice person who did a good job as Traffic Manager and was the equal of others who had held the position. (R. 657-658.) He did not have personal knowledge following the RIF that the company advertised for a new Traffic Manager.
The thirteenth witness for the plaintiffs was Mr. Charles Weaver, a college graduate who was a cost accountant for Bicron starting in November of 1989 and ending in February of 1995. The witness indicated that Bicron's Management Incentive Program was an upper management performance measurement which compensated the members of the program with bonuses for reaching certain goals. (R. 666-667.) During his tenure at Bicron, no female was a member of the Management Incentive Program and he considered upper management to be an "all boys network." (R. 667.) The witness also held the opinion that exempt female employees at Bicron, unlike exempt male employees, had a very limited opportunity for advancement, if at all. (R. 668.) Deluga and he did very similar types of work. Willing, who was a cost accountant, was promoted approximately eight months after coming to the Newbury plant. Mr. Kaczorowski told the witness that women should be submissive to men, that men should exercise control and authority over women in and out of the work place. (R. 673.) In approximately 1992 his salary was approximately $37,500 while Deluga's salary was approximately $27,000. This salary inequality prompted the witness to express his displeasure to his supervisor, the Controller (Mr. Green); the witness believed the disparity was the result of sex discrimination since Deluga had more work experience and was pursuing more education than Willing. (R. 674-675.) Willing also was placed in a better office in the executive office area, despite there being available office space in the accounting area, where he (Willing) would often speak with upper management and lunch with his supervisor (Mr. Mikolic). Nowac, on the other hand, had a less nice office in the accounting area and the supervisor (Mr. Mikolic) avoided speaking with Nowac. When Willing arrived, he was given some of Nowac's responsibilities. It was the witness's opinion that during Nowac's last three years with the company, Mr. Mikolic (Nowac's supervisor) withheld information that Willing had access to from Nowac and that this information was needed by Nowac for her to perform her duties; the witness provided only one specific example of this behavior by Mikolic. (R. 682-683.) Willing was also given more training than Nowac in a new computer system being utilized by the company. The witness felt that the way the Management Incentive Program was structured, made it financially rewarding for upper management to distort financial information for their personal gain. (R. 687.) At Bicron, one had to achieve a certain haypoint number to be included in the Management Incentive Program; the greater the haypoint number the greater the potential bonus. (R. 698.) For 1995 Bicron's budget goal for net operating income was $9,723,000 and the actual net operating income at the end of 1995 was $10,224,000. (R. 708.) In 1992 Bicron effected a RIP in which employees were terminated because the two facilities were merged. Reducing salaries via terminations would increase net operating income since those salaries would not be included in operating expenses, thereby increasing potential bonuses. (R. 715.) As of July 11, 1995 the company projected a year-end net operating income of $10,133,000 based on the amount of sales that were already booked. (R. 718.) Sales typically slowed down at Bicron in June to July of a given year, and picked up again starting in September to October. (R. 721.) As of July of 1995 there was an entry revising the projection of annual net operating income by listing $940,000 as an operating expense, thereby increasing net operating income and, in turn, bonuses. Yet the 1995 actual operating expenses did not list the $940,000, leading the witness to infer that there was no $940,000 in additional operating expenses incurred by Bicron in 1995 and that Bicron manipulated the financial data to show a false revised projection of net operating income goal of approximately $10,700,000 in 1995 (as noted by plaintiffs' counsel during the direct examination of this witness, the difference between the net operating income projection and the revised projection for net operating income is approximately $940,000). (R. 723-728.) By showing an increase of approximately $940,000, Bicron falsely gave the appearance of a financial crisis. (R. 729.) On cross-examination, the witness agreed that Bicron was ordered by the corporate office to treat an additional $940,000 as an expense in revised projections for 1995, since this sum was not included in the projected 1995 budget Bicron sent to the corporate office in late 1994. (R. 737-738.) The witness did not know who at the corporate office made the order to increase the projected net operating income for Bicron by $940,000, or why. (R. 742.) The witness admitted that he had many years of cost accounting work experience prior to his coming to Bicron and that he was paid $30,000 per year in the job he held before Bicron. At most, Deluga was employed at Bicron for no more than a year when he arrived. He was unaware that Deluga's Bicron position was her first full-time job as an accountant since she graduated from college and that her starting salary of $13,000 to $14,000 was the most money she had ever earned in a given year prior to coming to Bicron. (R. 745.) At Bicron, Weaver never worked anywhere but in accounting. He was not aware that Bicron paid for Deluga's MBA studies, that Deluga was once an hourly worker at Bicron in 1992, that she had been promoted and had received at one time a 100% pay increase. He had no personal knowledge as to how the Bicron budget or year-end statements were prepared or how the RIP expenses were to be treated because he never worked on the preparation of the company budget or statements and was not privy to management discussions concerning same. (R. 756-758.) During his re-direct examination, Weaver generally reiterated his direct testimony relating to the budget statements and the $940,000, adding that the $940,000 was included in the budget from corporate office in France. (R. 763-767, 771-772.) Weaver also added that Quackenbush's 1994 bonus was $39,000 and his 1995 bonus was approximately $125,000. (R. 768.)
The fourteenth witness for the plaintiffs was Ms. Lynn Keller, who testified that she was twenty-nine-years old and graduated from college in 1995 with a Bachelor of Science degree in Manufacturing Engineering from the University of Akron. (R. 775-776.) She started employment at Bicron's Newbury operation on June 22, 1990, as an hourly drafts-person in the engineering department. In time, she received a promotion to Product Designer, serving in that position for two-and-one-half years as an hourly employee. She voluntarily left Bicron on December 22, 1995, because she had recently received her degree and she wanted a salaried position. (R. 778.) Despite the fact that she and Gliner worked in different departments within the engineering department, which subdepartments are in different buildings, she considered Gliner to be a competent engineer. In her opinion, Mr. Corvo (the supervisor of the sales department) was aloof and impersonal to both men and women. (R. 781-782.) After Gliner was terminated in the RIF, Mr. Daniel Herr continued to work on Gamma Cameras, the same type of work that Gliner had previously performed in that separate building. It was her belief that Herr was hired in April of 1995 to replace Gliner. (R. 786.) Shortly after Gliner was terminated, the company promoted an hourly male engineer. Mr. Kevin Golda, who had been performing clerical engineering work to a salaried Junior Engineer position doing tasks that she felt that she could perform. (R. 787-789.) When she left Bicron she was being paid approximately $26,000 per year. On cross-examination, the witness testified that her two previous jobs prior to Bicron were at Burger King restaurants in hourly positions and she had no experience in the engineering profession. (R. 791.) She also admitted that Bicron paid for her final two years of college education. (R. 793-794, 814.) She also stated that Herr had worked at Lockheed Corporation on components contained in the space shuttle prior to coming to Bicron, but that she did not know what his salary was at Lockheed or why he was hired at Bicron or what the engineering department's needs were at that time. Likewise, the witness admitted that she knew Golda had prior engineering experience in an intern capacity when he was hired at Bicron. (R. 806.) On re-direct examination, the witness opined that gender discrimination was company-wide. (R. 812.) Reimbursement for college education was a company benefit available to any employee. (R. 815.) She left Bicron because there was no engineering position available for her to be promoted into at the time, that she was underutilized now that she had her college degree; she believed that the engineering manager (Mr. Kosuth) should have promoted her to Production Engineer because she had just received her college degree and had work experience within Bicron. She blamed this decision to not promote her on gender discrimination. (R. 821.)
The fifteenth witness for the plaintiffs, as if on cross-examination, was Mr. Daniel Herr, who testified that he came to Bicron on April 10, 1995. and had received his Bachelor of Science degree in Aerospace Engineering in 1989 from the University of Michigan. After graduating from college, he almost immediately went to work at Lockheed Corporation as a full-time engineer working in Houston, Texas, on key space shuttle components (the design and drafting of the tether for the shuttle). (R. 824.) Prom Lockheed he came to Bicron because Mr. Kosuth had told him in January of 1995 that the engineering capabilities at Bicron were going to be expanded by several positions. (R. 834.) The witness was not told that he was going to replace anybody. It was on his first day of work at Bicron that he learned that he was assigned to work on the Gamma Camera line; the same line as Gliner. He had some prior knowledge of Gamma Cameras before Bicron, but had never worked on them specifically. (R. 836-837.) In the Bicron interview/hiring process he was not told of any financial crisis or impending RIP at Bicron; to the contrary, he was told by Mr. Kosuth at an interview in February of 1995 that Bicron was a growing company with increasing sales. (R. 838-839.) Leading up to the RIP in August of 1995, the employees knew that there had been a slowdown in sales, but he did not know about the RIP until it was announced. The witness testified that when he came to Bicron his resume reflected that he had experience in the use of certain sophisticated computerized drafting and designing engineering tools, but he never told Mr. Kosuth of those skills at the interview because he had no working experience with those software programs. (R. 841-845, 852.) When he arrived at Bicron in April of 1995 he was given a Dell 486 computer for his use while Gliner was working on a Dell 386 computer. (R. 849.) After he arrived at Bicron and prior to the RIF, he learned the computerized drafting and design software for engineers. (R. 851-852.) Gliner was the main person, among others, who explained to him the design considerations only of the Gymnura Camera. When Gliner was terminated, he was given her former duties in addition to his own. (R. 857.) At Lockheed, his salary was approximately $41,000 per year (base pay of approximately $39,000 plus overtime). (R. 863.) His starting salary at Bicron as a Product Engineer was approximately $45,000 per year, not including a one-time compensation of $2,600 for his relocation expense. His salary at the time of trial was approximately $52,000 per year. (R. 867.) He did not receive any promotion or raise in pay until after the RIF.
The sixteenth witness for the plaintiffs was Mr. John Scott, who was a fifty-eight-year-old Senior Project Manager earning $72,732 at Bicron's Newbury plant when he was terminated during the RIP in 1995 after five years of service with the company. He has a Bachelors degree in Physics and an MBA. (R. 872.) When he started at Bicron in April of 1990, he was the Manager of Engineering. Gliner was hired as a Production Engineer a few months after him; she reported to him at that time. In February of 1994 he left his original position and Mr. Kosuth took over supervising the engineers. He then assumed the duties of Senior Project Manager for a major production line dedicated to a Chicago project, which duties forced him to move building locations at Newbury. (R. 874-875.) When he supervised Gliner he considered her to be competent to above-competent, depending on the area rated. In January of 1993 he sent a communication to Ms. Lashchuk (the Director of Bicron's Newbury Human Resources Department) seeking to have Gliner's annual salary of $31,559 adjusted upward to around $40,000 annually. He suggested that this be accomplished by awarding Gliner an 8% merit increase at the end of the year rather than the customary employee merit increase of 5%, followed by two other equity adjustments within six months of the year-end merit increase, followed by another equity adjustment the following year (1994), thus taking her to the $40,000 compensation level within one year of his proposal. (R. 881.) This overall proposal was disapproved in July of 1993 and in January of 1994 by Mr. Kaufman (Bicron's corporate Director of Human Resources) (R. 882.) The witness also corroborated the cyclical nature of sales and profits at Bicron. When he had interaction with some of the other plaintiffs while at Bicron, he found them to be competent and professional, too. On cross-examination, the witness stated that when he began his new duties on the Chicago project, his office was in a different building than Gliner's office. Eventually, Gliner received a 13% increase in salary in September of 1993. (R. 895.) He admitted to writing the communication in 1993 because he had reviewed industry periodicals and had concluded that Gliner was not being competitively compensated relative to the industry in general based on information within the industry and in relation to other engineers in his department. (R. 897, 912-913.) His communication did not mention gender or gender discrimination as a reason for the perceived pay inequity. (R. 898.) Each department at Bicron had its own annual budget, based on annual financial projections for the following year, out of which department operating expenses, salaries and salary increases of department employees must be paid. This annual budget figure necessarily produced a budget constraint; if the department management proposed that one employee receive a 40% salary increase, the chances were that there would not be enough money in the budget to give increases to other employees or would cause a shortfall in paying other operating expenses. (R. 900.) After February of 1994, when his job duties were switched and he wasn't working in the engineering department, he could not recall if he had any personal knowledge of problems the engineering department was having with returns by Siemens Corporation of defective Gamma Cameras allegedly due to leaking seals caused by a design flaw in the design submitted by Siemens or by a manufacturing defect of the unit, or the solving of the design problem or change in the manufacturing process by the engineering department. (R. 904-906.) He did not know Mr. Herr. He did not know about any of the details which went into the planning discussions for the RIF. (R. 907.) In 1993 and 1994 he participated in the Management Incentive Program. The salary information for employees was confidential and was not shared by the company with anyone but the particular employee. Department managers only had access to salary information for employees under their department. (R. 908-909.)
The seventeenth witness for the plaintiffs was Ms. Gliner. (R. 919.) She and her family emigrated from the Soviet Union to the United States in 1978. She became a naturalized citizen of this country in March of 1984. She also testified that the field of engineering in America, in education and in industry, is dominated by males. (R. 922-923.) In her present employment at Picker International, she is one of two female engineers among fifty total engineers at the company. (R. 923.) She received her Bachelors degree in Mechanical Engineering from Cleveland State University in 1982. She started working at Bicron in the summer of 1990 as a CAD Designer, but was rapidly promoted to Production Engineer in the inorganic engineering department earning an annual salary of $28,000. (R. 930-931, 960.) Ms. Lashchuk, the Director of the Human Resources department at Newbury, told the witness that she (Lashchuk) was pleased that there was finally a female engineer at Bicron. (R. 932.) She claimed to be the only female engineer (not drafts-person [an entry level engineering job] or designer [an intermediate engineering job] employee, who also had engineering degrees but did not hold the job title of engineer) at Bicron while she was employed there up to the 1995 RIF. Her primary work at Bicron was with the Gamma Camera production line. She disagreed with Mr. Corvo's assessment of the capability differences and conceptualizing attributes between male and female engineers. (R. 941-942.) At the time of the RIF, her annual salary was approximately $38,000. (R. 947.) In approximately 1991 to 1992 she complained to Ms. Lashchuk and Mr. Scott about her salary level; she believed that she was underpaid based on her performance in the engineering group and salary levels of production engineers in general as reported in industry trade periodicals. (R. 948.) It was not until after this lawsuit was filed that she discovered that Mr. Scott had communicated with the Human Resources Department in an attempt to raise her salary. Her performance reviews by Mr. Kosuth in 1994 and 1995 (Mr. Scott's replacement as manager of the engineering department), as opposed to Mr. Scott's reviews, were very negative of her, giving her an overall below average rating and she disagreed with the poor evaluation. (R. 950-951.) When she confronted Mr. Kosuth about the poor review, he allegedly told her that while her physical appearance and speech suggested she was a woman, that she acted like a man and that he was unsure how to treat her because of it. (R. 956.) Kosuth asked her how her husband dealt with her male ego, whether she planned on having more children in light of her traveling for business purposes. (R. 957.) She thanked Kosuth for the "male ego" remark, taking no offense to the remark, but was offended by the remainder of the remarks because she thought they were based on her gender. (R. 957-958.) She requested of Kosuth on a number of occasions in 1994 and 1995, prior to the hiring of Mr. Herr, that she be given training relative to engineering design software on the computer so that she could better do her job. (R. 966-967.) Kosuth declined the requested training, claiming that she would be too busy in her present duties to take time for the training and that her computer was not powerful enough to run the software and he did not have money in the budget to purchase a new, more powerful, computer for her. (R. 967-968.) Mr. Scott Huth was hired shortly after Kosuth, and Huth was provided extensive training on the engineering software, even though Kosuth told her that Huth was hired as an expert in the use of that software. (R. 968-969.) She saw no opportunities for women to advance in Bicron. (R. 970.) She also felt discriminated against in the software training when Mr. Herr was provided the new computer and training on the software when she was denied the opportunity for training. It was her opinion that Mr. Herr knew nothing about Gamma Cameras when he was hired and that she was ordered to help him learn them. (R. 971-972.) The RIF came as a complete surprise to her when she was electronically paged on August 15, 1995 and told of the terminations due to economic reasons. (R. 973-974.) She also felt discriminated against by Kosuth when he ordered a number of copies of a lengthy engineering handbook for his engineers, but only the men received copies. (R. 977.) After the termination, she did not work for a year and she claimed that she lost a pregnancy due to stress during that year of unemployment. (R. 980.) The witness, over the objection of the defendants, then related how she met Mr. Kaufman at a Holiday Inn hotel in December of 1995 (approximately four months after the RIF). At this alleged meeting, Mr. Kaufman allegedly told Gliner that Mr. Quackenbush was a malicious and vindictive person who had problems dealing with professional women. (R. 982-983.) Kaufman also allegedly told Gliner that Mr. Corvo (Mr. Kosuth's supervisor) also had problems with professional women. (R. 983.) Kaufman also allegedly told Gliner that St. Gobain, being a French company influenced by French culture, did not permit women, whether educated or intelligent, to advance to high places with responsibility for important decision making in the company. (R. 983-984.) Kaufman also allegedly informed Gliner that the termination list was prepared in the first quarter of 1995 and that it was his opinion that the RIF was not economically necessary and was done to preserve or enhance the bonuses for the managers that year. (R. 984-985.)
On cross-examination of Gliner the witness testified that the only supervisor to whom she reported and had a problem with was Mr. Kosuth. (R. 990.) She recalled getting a 13% salary increase as a result of Mr. Scott's help. She was unaware that an in-house videotape presentation depicting and explaining the Bicron operations, which production she found offensive because it allegedly showed and identified male employees while not doing the same for women employees, in particular Gliner, who was only shown in a long shot which made it difficult for a viewer to identify her, was produced under the direction of Mr. Wrobel, not upper management as thought by Gliner, and was only shown one time within Bicron. (R. 992-993.) Gliner next admitted to eventually receiving the updated engineers handbook manual, but denied that the updated manuals were distributed in several batches as they arrived and Kosuth never told her that the manuals were on back order; Gliner admitted that she had been issued the original version of the manual and that the updated version, which all employees received over time, was not different than the original version she was using. (R. 994-995.) Gliner also admitted that she was not involved in the hiring of Mr. Herr and did not know his work history and did not know what factors were utilized in setting his salary. (R. 997-998.) Herr received no outside training on the software programs while at Bicron, instead, he was training himself. (R. 999.) She was unaware that Herr had experience at Lockheed doing three dimensional modeling on the computer; she had no such modeling experience. (R. 999.) She was unaware that Herr was using his documentation skills collecting and loading data from all over Bicron into the computer to improve the engineering department's documentation capabilities, aiding in design/manufacturing/production decisions, and upgrading the three-dimensional modeling capability of the engineering department. (R. 999-1000.) Gliner then identified, from one of Kosuth's reviews of her performance, that her problem areas were not looking "for additional ways to add value" and not looking "for problem areas and come up with solutions." (R. 1001.) Gliner then admitted that after the 1995 RIF that there were still female engineers at Bicron, one of whom (Ms. Polkowski) was, like Gliner, a production engineer, but was also a member of upper management. (R. 1002-1004.) Gliner had no personal knowledge whether women held important management jobs in St. Gobain outside of Bicron and was unaware of a number of women identified by defense counsel as specific examples of female upper management within St. Gobain. (R. 1004-1006.) Her general job duties included analyzing and improving the hermetic sealing systems and epoxy construction of the Gamma Camera line, but she did not think that duty applied to the Gamma Cameras produced by Bicron for Siemens. (R. 1011.) When she complained to Kosuth about her salary, she did not indicate to him a specific target salary she wanted to achieve. (R. 1012.) She had no actual knowledge of what others in the company were paid because that information was confidential; her only information concerning what others were supposedly paid was gathered through her eavesdropping on other employees' conversations and then, based on the snippets of financial information she gleaned, she would guesstimate what their salary was in relation to hers. (R. 1024-1025.) She never asked Kosuth for a specific promotion or job within his department and she never complained to Quackenbush about her lack of promotion at Bicron. (R. 1017.) After the RIF (where her annual salary was $38,400), she was employed a year later in 1996 at Namco Corporation at a annual salary of $48,000, then she was employed in 1997 at Picker International at an annual salary of $55,000. (R. 1017-1019.) She did not know what Herr's salary was at Lockheed and did not know if Bicron had to match it in order for Bicron to obtain Herr's services. (R. 1033.) Given that she only worked with Herr for four months, she admitted that she was in no position to evaluate the quality of work Herr was performing for Bicron. (R. 1034.) Another of her job responsibilities was to check engineering designs and interact with customers (note, Siemens was a customer of Bicron) to understand their applications and ensure the customers' ultimate satisfaction with the product. (R. 1035-1036.)
The eighteenth witness for the plaintiffs was Ms. Deluga. (R. 1039.) Her educational experience is as follows: high school degree in 1976; an Associates degree in 1984; a Bachelors degree in Business Administration in 1988 from Ursuline College; and, an MBA from Lake Erie College in 1992. Her MBA was earned through her taking advantage of Bicron's education reimbursement program, which program was open to all employees. (R. 1040.) From 1978 to 1987 she was employed as an assistant accountant at a ladies apparel manufacturer, doing cost accounting and general accounting work and was paid approximately $13,000 to $14,000 per year in the year she left that job. She began working for Bicron in 1988 in cost accounting at an annual salary of $15,000. At the time of her hire at Bicron, she did not consider the Bicron salary to be competitive based on her prior work experience and her having a Bachelors degree. (R. 1047-1048.) The low starting salary at Bicron was outweighed by her being told by the interviewers that the company was growing, that there was potential for advancement, and Bicron had a tuition reimbursement program. (R. 1048.) In 1989, Deluga's annual salary had increased to $16,557. (R. 1054.) In July of 1991 she complained to Ms. Nowac about salary because Deluga had concluded that she was entitled to a salary increase based on her working for her MBA and a male cost accounting counterpart, Mr. Charles Weaver (who was hired by Bicron in 1989), "would not be settling for sixteen or seventeen thousand dollars a year." (R. 1049.) The company records provided in discovery indicate that Mr. Weaver had a Bachelors degree and started at an annual salary of $31,000 in 1988. Those records also indicate that Mr. Luther was hired at Bicron in 1988 at an annual salary of $34,368. (R. 1054-1055.) In early 1995 prior to his leaving the company, Weaver was working in the MIS Department (which is not cost accounting). He was paid $43,389. (R. 1055.) Also in 1995, Luther, whose work duties utilized a French-based financial software package to convert the American affiliate's financial data into the French parent's corporate accounting system, was paid $45,864, and Deluga, whose work duties utilized American manufactured computer spreadsheet software (Lotus and Excel) for the Bicron financial data, was paid $35,064. Mr. Willing became her and Luther's supervisor in March of 1994. (R. 1058.) Willing's performance review of Deluga for November and December of 1994 categorized her work performance at the second highest standard of the four standard range, "fully competent." (R. 1060.) Luther's work performance from August of 1993 to July of 1994 was rated as "capable," which is the third highest standard in the four standard range. Deluga believed that her pay inequality was based on gender discrimination based on her experience, education, work performance, and a generalized observation of how the company (Bicron and St. Gobain) treated female employees with regard to lack of females being advanced into upper management, and not giving females opportunities to train in new areas which they considered critical in performing their jobs or which would aid in advancement. (R. 1061-1062.) Nowac was her direct supervisor and the witness complained to her about salary and training opportunities. (R. 1063.) She believed she was part of the RIF in 1995 because she was a woman and because of the reasons previously mentioned; she could think of no other explanation for being terminated outside of gender discrimination. (R. 1064.)
On cross-examination, Deluga testified that at the time she was hired by Bicron in July of 1988, she had been a full-time student and part-time hourly sales clerk at a sporting goods store for about two years. (R. 1065, 1081.) She had left the apparel industry full-time job in May of 1987 because the company went out of business. The salary she made at the apparel manufacturer was the most money she had ever earned in one year up to the Bicron employment. (R. 1066.) When she interviewed at Bicron for the hourly position in the accounting department at the Newbury plant, she asked for a "competitive salary" and did not provide any salary range or dollar figures. (R. 1067.) She does not remember if she had any other job offers in the summer of 1988 besides Bicron's despite sending out approximately ten resumes. When she was hired at Bicron she told no one that her starting salary was not competitive. (R. 1069.) In 1991 she was still an hourly employee earning $20,592. (R. 1069-1070.) In response to her complaint to Nowac in 1991, she was converted from an hourly employee to a salaried employee and given a pay raise to $27,000 in annual salary as of January, 1992, an approximate increase of 31% in pay. (R. 1071-1072.) In July of 1992 her salary was increased again to reflect an annual salary of $30,000, approximately an 11% increase. Receiving two salary increases in a given year is unusual at Bicron because pay is normally revised only one time per year. (R. 1072.) While at Bicron she did not know what Weaver's or Luther's salary was, what factors went into it during the interview process, their prior work experience, who set the salary, or what they had earned at their prior employers. (R. 1073-1074, 1078-1079.) She did know that Nowac was one of the Bicron supervisors who interviewed Weaver and recommended him for the job as the best qualified candidate. (R. 1075.) The education reimbursement program at Bicron paid in excess of $13,000 for her to obtain her MBA degree at a private college. (R. 1075-1076.) She also received severance pay from Bicron from the time of the RIF through November of 1995, and approximately two months after that severance pay expired she accepted employment at Advanced Ceramics at a salary higher ($38,000 to start) than she had been paid at Bicron. (R. 1076-1077.) Within a year of working for Advanced Ceramics she received an annual salary increase to $39,000. The records indicated that at the time of the RIF, Luther had been employed at the company for nearly twenty-five years. (R. 1079.) On re-direct examination, she stated that she did not favor the company firing either herself or Luther, only that she should have been more fairly judged, essentially taking into consideration her job performance and experience, and that her gender should not have been a factor in her termination. (R. 1083.)
The nineteenth witness for the plaintiffs was Ms. Joiner. (R. 1084.) Her educational background includes a high school degree in 1961 followed by her receipt of a secretarial certificate from Dyke Business College in 1962. (R. 1085.) She has also sporadically taken some individual courses throughout her career. Her work experience prior to Bicron was as a secretary and/or receptionist, which included some general accounting responsibilities, at several different companies. She started working at Bicron in 1984 as a temporary employee making $5.75 per hour in the accounting department. In 1985 she was transferred to the order entry duties as an hourly employee in the Sales Department. She was promoted to Order Entry Processor in the Sales Department at Bicron, a salaried position, in January of 1990. (R. 1088-1089.) The order entry position dealt with entering sales orders into the computer system, sending them to engineering and production, and after shipment of the product to prepare invoicing so that the company could get paid. (R. 1089.) In 1990 she reported to Ms. Barbara Rasmussen, who eventually was replaced by Mr. Hacy Green, then Mr. Wes Drown. In 1993 she was promoted to the supervisory management position of Traffic Manager, whereby four employees (three men and one women) reported to her at the Newbury plant. (R. 1091-1092.) The promotion to Traffic Manager, a newly created position, came about because in 1993 the company had purchased a new computer system which caused the company to disband the entry order department and Hacy Green informed her that the Traffic manager position was available and asked if she was interested in interviewing for it. Other employees, including Mr. Hayhurst (who would, upon her promotion, be one of the three male employees she would supervise as Traffic Manager), interviewed with Mr. Brown for the Traffic Manager position. The Traffic Manager's general responsibilities included managing the transportation of shipments to and from the Bicron plants in Newbury and Solon and working with common carriers to obtain favorable cost-effective shipping rates for the company which would help justify the salary of the Traffic Manager. (R. 1093-1095.) In her first year as Traffic Manager, the company realized approximately $95,000 in savings related to shipping rates which was favorably noted in her performance review that year. The salary range for the Traffic Manager position, based on a haypoint banding range of between 350 to 409 for the position, was between $36,000 and $54,000, with a midpoint of $45,000, in 1993. (R. 1096-1097.) The Traffic Manager position was allegedly assigned a specific haypoint number of 366 and her starting salary as Traffic Manager was $30,000 ($6,000 below the minimum of the salary range provided by the haypoint banding). As of June 1, 1995 Joiner's salary was $34,000. (R. 1101.) Also in 1995 the range of salary for a haypoint number of 366 was a minimum of $37,100, a midpoint of $46,400, and a maximum of $55,700. (R. 1100.) She did not believe that work performance was a factor in being paid within a haypoint banding range. A company record, Plaintiffs' Exhibit 124 which was received during pre-trial discovery, reflects a typed-in haypoint number of 268 next to her name for August of 1994 and June of 1995. (R. 1101-1102.) A haypoint number of 268 would place one in a salary range for 1994 of a minimum of $28,900, a midpoint of $36,100, and a maximum of $43,400. (R. 1103.) In 1995 a haypoint of 268 would place one in a salary range of a minimum of $29,700, a midpoint of $37,100, and a maximum of $44,500. (R. 1103-1104.) Thus, her salary would fall within the range of available salaries if her haypoint were 268 in 1994 and 1995. She believes that her haypoint number was lowered from 366 to 268 to make her salary fit into an acceptable salary range. (R. 1104.) She claimed there were no major changes to her job duties or in her performance to justify the lowering of the haypoint number and the job was not reevaluated to her knowledge. (R. 1104-1105.) She testified that the job description for the Traffic Manager position the company provided in discovery, see Plaintiffs' Exhibit 235, which reflected a haypoint number of 268 for the position, did not correlate to the responsibilities she had in the position in that she actually had greater responsibilities than reflected in the company-provided profile for the position, which lessened responsibilities for the haypoint 268 seemed to apply to positions in the sales department. (R. 1106-1115.) The witness next related how she complained to Ms. Lashchuk in October of 1994 that her salary was below that being paid to an hourly subordinate named Mayhugh. She next complained about alleged pay inequity to her supervisor, Mr. Brown, in February of 1995 during her annual review, which did prompt an increase in her salary from $30,000 to $34,000. (R. 1116-1117.) The witness believed the pay inequity was based solely on gender discrimination because, in her opinion: there were no women in upper management; there were no women promoted to upper management; women were not members of the Management Incentive Program so they did not get bonuses; women were not transferred into the company, they were not offered transfers out of the company; and, based on her conversations with some other female employees (Nowac. Gliner, Lynn Keller, and Lashchuk), women were generally paid lower than men at Bicron, particularly where equal positions were compared. (R. 1118-1119.) Her discussions with Lashchuk in the human relations department relative to gender discrimination were general in nature. (R. 1119.) She felt she was underpaid because she believed her job responsibilities warranted the increased salary and she was allegedly told when she took the Traffic Manager's position that she would be reviewed twice within the first year and given increases in pay, which increases did not occur as allegedly indicated. (R. 1119-1120.) She felt she was terminated because of her gender because she had saved $95,000 in shipping costs in her first year as Traffic Manager and could not attribute the termination to any factor other than gender. (R. 1120.) Shortly after her termination, and despite allegedly being told by management that her position was being eliminated, she learned of an advertisement for a position at Bicron in the Solon plant which contained some of her former responsibilities. (R. 1121-1124.)
During cross-examination of Joiner, the witness testified that when she was promoted to the newly created Traffic Manager position in 1994, the company, through Mr. Wes Brown, issued a personnel announcement with respect to that promotion. (R. 1127-1128.) While at Bicron she worked exclusively at the Newbury plant. In 1990, prior to St. Gobain purchasing Bicron, her annual compensation was $20,592. In 1991, following the St. Gobain acquisition of Bicron, her salary was $22,240 (an 8% increase from 1990). (R. 1129-1130.) In 1992 her salary was $23,351 (a 5% increase from 1991). (R. 1130.) In 1993 her salary was $24,520 (an approximately 5% increase from 1992). (R. 1131.) In 1994, the year she was promoted to Traffic Manager, her salary was $30,000 (an approximately 22% increase from 1993). (R. 1131.) In 1995 her salary was $34,800 (an approximately 13% increase from 1994). (R. 1131.) She also admitted that during the five years that St. Gobain owned Bicron prior to the 1995 RIF, her salary increased 65%. (R. 1132-1133.) If one compares her annual compensation for the ten years that she worked at Bicron, her compensation from the time she started to the time she was terminated increased almost 300%. (R. 1133.) Payroll records for her subordinate, Mr. Hayhurst (who was the lead person in the shipping and receiving department at the Newbury plant and had been employed at Bicron since 1979), indicate that during the same ten-year period, his salary increased from $18,720 to $33,767.50 (an approximate 80% increase). (R. 1134.) In fact, she helped to authorize a 4% annual increase in pay for Hayhurst in 1994 at a time when she received a 22% increase. Similarly, she authorized Hayhurst a 4% pay raise in 1995 while she received a 13% increase. (R. 1134-1136.) The witness also admitted that prior to working at Bicron, Hayhurst had been employed at Neff Perkins Corporation for twelve years in that manufacturer's shipping and receiving department, giving him a total of over twenty-five years experience in the area of shipping and receiving. (R. 1138.) She first learned of her specific haypoint number in October of 1994 when Lashchuk told her it was 268. (R. 1143-1144.) Her exclusive basis for believing that her haypoint was lowered from 366 to 268 was the June 1995 document (Plaintiffs' Exhibit 124, Defense Exhibit AA) containing a typewritten list of employees, their haypoints, and handwritten/typed corrections relative to the haypoints for a number of employees; she did not know why that document had been created. (R. 1144-1149.) She was not personally aware of anybody who was hired by Bicron within nine months of her termination who assumed any of her former duties, and the post-termination advertisement she relied upon in her earlier testimony, which she attributed to Bicron, was a post-office-box advertisement for Chardon, Ohio, which did not contain the identity of the hiring firm. (R. 1152.) Following her termination from Bicron, during which time she received a severance package, the witness earned an additional $800 in 1995 performing temporary employment, and another $600 in 1996 from another temporary services firm. In the summer of 1996 she went to work at her husband's business earning $2,500. In October of 1996 she went to work as a full-time hourly employee at Jet, Incorporated, earning $14.53 per hour (roughly $30,222 per year). In May of 1997 she received a pay increase to $14.98 per hour (roughly $31,158 per year). At the time of trial she earned $15.15 per hour (roughly $31,512 per year). (R. 1153-1155.) During the October 1994 conversation with Lashchuk concerning pay inequity, the witness took Lashchuk's advice to discuss the matter with the witness's supervisor, Mr. Brown, during the witness's annual performance review in January of 1995. (R. 1156.) Lashchuk wanted to wait until the witness had discussed it with Mr. Brown before Lashchuk would consider doing more. (R. 1156.) On redirect examination, the witness reviewed the exhibits she had been shown on direct examination and noted that in 1994 and 1995 Hayhurst's position had a haypoint range of 250 to 299. (R. 1159.) On re-cross examination, the witness noted that Hayhurst was an hourly (or nonexempt) employee as opposed to her salaried (or exempt) status and that hourly employees do not have haypoints assigned to them. (R. 1162.)
The twentieth witness for the plaintiffs was Ms. Nowac. (R. 1166.) She received from John Carroll University a Bachelor of Arts degree in social studies in 1972 and an accounting degree in 1980. She held her first accounting job in 1980 following the receipt of her degree in that subject. From 1980 to 1983 she worked at the accounting firm of Monastra Company performing general accounting and financial audits for small businesses. From 1983 to 1987 she was employed at Graphite Sales, Inc., a small graphite reprocessing company, as an accounting manager performing general accounting, financial statements, payroll, and taxes. From 1987 to 1988 she worked for the United States Internal Revenue Service as a tax officer auditing business tax returns. She started working at Bicron on March 28, 1988, two years prior to Bicron being acquired by St. Gobain in March of 1990. (R. 1170.) She interviewed with the then Chief Financial Officer (Mr. Gene Connor) and the Human Resource Manager, Donna Lashchuk, for an accounting position. Her initial duties were generally to help the company convert their manual financial system to a computerized system and she reported to the Chief Financial Officer. (R. 1171-1172.) In June of 1988 (approximately three months after being hired) she was promoted from accountant to accounting supervisor. In September of 1989 (approximately eighteen months after being hired) she was promoted from accounting supervisor to manager of accounting effective with responsibilities for all general and cost accounting and approximately six subordinates. (R. 1172-1173.) When she was hired at Bicron her starting annual salary was $25,000. (R. 1177.) Eventually, she reported to her immediate supervisor, Mr. Hacy Green the Controller, who was ultimately replaced by Mr. Dan Mikolic. She believed that Mr. Quackenbush came to Bicron in 1991 as General Manager. At the end of 1992, effective January 1, 1993, the Solon and Newbury Bicron plants payrolls were being consolidated to be handled out of the Newbury location. (R. 1180-1181.) During her entire tenure at Bicron, Mr. Quackenbush never personally complimented her for her work performance, but Mr. Hacy Green often complimented her on the quality of her work. (R. 1183.) On the other hand, Mr. Mikolic (who became her direct supervisor after July of 1994) never complimented her, either. (R. 1184, 1188.) Mr. Willing and the witness were both Accounting Managers in 1993 with similar job descriptions. See Plaintiffs' Exhibit 241. (R. 1185.) Plaintiffs' Exhibit 208.21, which the witness prepared from materials gathered in pretrial discovery, details the witness's base annual salary during her tenure at Bicron and compares that Bicron salary against that of Mr. Willing's base annual salary, as follows:
 Nowac Willing 1988---$25,000 NA 1989---$34,000 NA 1990---$35,700 NA 1991---$38,100 NA 1992---$40,767 $47,160[11]
1993---$43,621 $49,524 1994---$46,236 $51,504 1995---$47,998 $53,568 1996---NA $56,246
Nowac continued her direct examination stating that both she and Willing shared the same haypoint number of 464. (R. 1187.) The witness then recalled a very small computer training seminar she attended in Boston in 1994 with Mikolic (her and Willing's direct supervisor at the time), Willing, Dave Neff, Charles Weaver, and the seminar instructor. (R. 1188.) The reason for the training was because Bicron was in the process of converting their present Hewlett-Packard HP-3000 computer system to an integrated IBM AS-400 system; the seminar instructed those attending on the use of the IBM system. During the seminar, Nowac engaged the instructor in a line of questioning which forced the instructor, who could not adequately answer Nowac's questions, to allegedly admit that the software still had some problems and the company was trying to work those problems out. (R. 1190.) As Nowac pursued the instructor with questioning dealing with areas related to the software problems. Mikolic interrupted the exchange and told the instructor to move on and ignore Nowac's line of questions. Nowac, feeling embarrassed and humiliated before her peers, took offense at the purported rudeness of Mikolic in the manner he had handled the situation. (R. 1190-1191.) Nowac did not consider her continued questions to the instructor to be irrelevant. (R. 1191.) She took note that Mikolic did not act in such a fashion to any of the males in attendance. Nowac admitted that the IBM system did have software problems in its initial use at Bicron which required a number of software patches to enable the new system to run correctly. The witness thought that Mikolic undermined her work on almost a daily basis by withholding or delaying information from her which she felt she needed to do her job, by not renotifying her closer to the actual day about the visit of an auditing group[12], by giving help to other employees projects ahead of hers, or, when she had a problem with the computer system and she asked for his assistance he would blame her for being the cause of the problems. (R. 1192-1193, 1195.) She felt that Mikolic was trying to get her to quit by making her job difficult. (R. 1193.) Nowac opined that Mikolic would not speak to her in person for perhaps weeks on end, relying instead on interoffice electronic mail via their computers or by his telling other people to pass some information from him on to Nowac. Nowac believed that Mikolic often spoke in person to Willing, whose office adjoined Mikolic's, and the two men would also frequently lunch together, which Mikolic never did with her. (R. 1193-1194.) Her explanation for this allegedly disparate treatment between her and Willing by Mikolic could not point to any particular business reason; instead, she opined "I felt because I was a woman and maybe I was a threat to him [Mikolic]. I don't know. Maybe he couldn't communicate with me." (R. 1194, explanatory note added.) Nowac testified that Mikolic did not humiliate or undermine the work of the male employees; that she was a woman, thought the witness, was the reason for Mikolic's allegedly poor conduct toward her. (R. 1197-1198.) For 1994, Mikolic rated her job performance as an Accounting Manager as capable and fully competent. During her meeting with Mikolic in February of 1995, at which time the two discussed her 1994 performance review, Mikolic told her that she needed to attend more classes on the IBM computer system because she needed additional knowledge of the integrated systems and that she was not "up to speed with the other people related to the computer." (R. 1201.) Mikolic, according to Nowac, was responsible for scheduling classes for the IBM computer system and deciding which employees would attend which classes. (R. 1202.) Nowac stated that she was asked by Mikolic to attend a total of three of the computer classes out of the approximately twenty to twenty-five offered. Mikolic scheduled Willing to attend approximately ten of the classes and Mr. Weaver (who worked in the MIS department and was acting as the project manager for the computer conversion at Bicron) to attend all of the classes. (R. 1203.) She did not attend any of the classes which Willing attended and which were beyond Willing's normal duties of cost accounting; her classes related to general accounting and financial overview while some of Willing's related to more than just cost accounting. (R. 1203-1204.) Willing had come from a St. Gobain plant in Delaware that was shutting down operations and he was hired into the Solon plant while she was operating out of the Newbury plant. (R. 1207.) She did not believe Bicron needed another accounting person at the Solon plant when Willing was hired. When Willing and she were Accounting Managers at Newbury following the consolidation and reorganization of the payrolls, three of her six subordinates were directed to report to Willing rather than her. (R. 1209.) In her opinion, Willing was not performing any duties which she did not already perform or had performed. She was unaware of any economic crisis at Bicron in 1995. (R. 1210-1211.) Prior to the August 1995 RIF and within six months following the RIF, Bicron hired "numerous" employees who "probably" added approximately $800,000 in additional salary burden to Bicron. (R. 1213-1214.) Based on the documents that were provided to her during discovery, Nowac opined that the severance costs associated with the RIF were approximately $330,000. (R. 1214-1215.) Nowac next testified that she had complained to Green concerning her salary on two occasions and to Mikolic during the February of 1994 performance review meeting and again shortly after that meeting. Mikolic allegedly told her that he would get back to her, which he never did. (R. 1215-1216.) Nowac, while at Bicron, was aware of the steps that Mr. Green had taken on her behalf in attempting to increase her salary, but was unaware that Green had offered to decrease his own planned yearly increase so as to give her an increase. (R. 1216-1217.) She also related to having spoken with Lashchuk concerning pay inequity and disparate treatment as opposed to male employees; Lashchuk allegedly sympathized with Nowac based on Lashchuk's own experiences at Bicron. (R. 1218-1219.) Next, Nowac told of how Deluga had come to her and asked whether there was pay inequity as between Deluga and Mr. Weaver, both of whom were reporting to Nowac and both of whom were Cost Accountants at the time. (R. 1219-1221.) Nowac believed that the salaries of Deluga and Weaver were inequitable so Nowac complained to Mr. Green, who told Nowac to speak with Lashchuk. Lashchuk suggested that they write up job summaries and Nowac make a salary recommendation. (R. 1220-1221.) Nowac did so and submitted them for approval.
Nowac next related how she entered into the computer's pay records for exempt employees the typed haypoint numbers, and not the other haypoint numbers in the margins on the revised document which arrived approximately ten days later, as reflected on the June 13, 1995 and June 23, 1995 documents admitted as Plaintiffs Exhibit 125/Defendants Exhibit HH. (R. 1228-1232, 1295-1297.) Nowac did not know how it was the revised haypoint document came to be produced and surmised that the revised haypoint numbers (some of which were increased and some of which were decreased, both for males and females) came from a review of employee records and were done to correct mistakes. (R. 1232-1243.) Reviewing the other employees with haypoints of 268, which would indicate a non-supervisory/manager title, all those with 268-numbered employees who did have supervisory responsibilities (though not necessarily a supervisor's title) are women. (R. 1242-1244.) Nowac believed her pay inequity, as compared to Willing's salary, was based on gender discrimination because she believed that she had the same responsibilities as Willing and had more experience than Willing. (R. 1245.) Nowac also believed, without being specific, that gender discrimination kept her from being trained and promoted at Bicron. (R. 1245.) Nowac believed that her 1995 termination was based on gender discrimination because: the RIF disproportionately affected the exempt professional managerial females within the company, terminating, according to the witness, six out of the eighteen women in that class; the females that were terminated were lower paid than their male counterparts; women only represented 12% of the company payroll. (R. 1246.) According to Plaintiffs' Exhibit 7.5, a graph which was prepared by Nowac, of the total male exempt employee population at Bicron only 8% were terminated in the RIF while out of the total female exempt population 32% were terminated. (R. 1246-1247.) In comparing the bonuses Bicron paid to certain employees in 1994 and 1995 in the Management Incentive Program, Nowac noted the following employees and amounts:
 1. Mr. Kaczorowski---1994 base salary of $99,120; 1994 bonus of $14,977.30; 1995 base salary of $103,584; 1995 bonus of $35,115.
 2. Mr. Murphy---1994 base salary of $110,844; 1994 bonus of $11,926.81; 1995 base salary of $111,500; 1995 bonus of $34,923.
 3. Mr. Quackenbush---1994 bonus of approximately $39,000; 1995 base salary of $165,000; 1995 bonus of $125,650. (R. 1249-1252.)
On cross-examination, Nowac testified that while she was at Bicron, Mr. Kaczorowski was the Chief Financial Officer from 1992 forward and reported to Mr. Quackenbush, the General Manager of Bicron. She also volunteered that Mr. Kaczorowski later became the International Controller. (R. 1253-1254.) Beneath Mr. Kaczorowski, at various times, were Mr. Connor, then Mr. Green, then Mr. Mikolic. She reported directly to these three men who in turn reported to Mr. Kaczorowski. Nowac believed that she should have made the same salary as Willing at all times. (R. 1256.) She was not aware that Willing had been paid slightly more than $43,000 annually at his job in Delaware prior to coming to Bicron. (R. 1257.) Willing had started at the Delaware job in 1989, within one year of Nowac starting her job at Bicron. She was paid $23,000 annually while working at the Internal Revenue Service and when she interviewed at Bicron she gave them, in writing, her salary demands. (R. 1258.) Bicron met her salary demands of $25,000 in 1988 when they offered her the position at Bicron. (R. 1259.) She did not know what Willing's salary demands were when he interviewed at the Delaware affiliate of St. Gobain in 1989, or what that Delaware company gave him to induce him to come to work for that affiliate, or what he was paid thereafter in Delaware prior to coming to Bicron in 1992. (R. 1259-1260, 1261.) She was also unaware that Bicron had a standard relocation transfer policy giving an employee, such as Willing, a one-time automatic pay increase when transferring between two St. Gobain affiliates. (R. 1261.) Nowac's problem with Willing in 1992 was that she was not paid the same as his salary, that Bicron should have given her an immediate raise of $7,000 in her salary to match Willing's starting salary of $47,000 because, despite her not knowing his background or his salary history and negotiations, they had equal jobs at Bicron. (R. 1262-1263.) Nowac admitted that her reason for having equal salaries was not based on she and Willing sharing the same job titles, job requirements or job descriptions. (R. 1264.) Instead, she bases her belief on the sole notion that it was the salary they paid Willing. (R. 1264-1265.) In the three years she compared herself to Willing, her pay records indicate that she received an 18% increase in salary. (R. 1266.) She did not know who assigned Willing his salary. Also in the three year period she compared herself to Willing, his salary increased 15.5%. (R. 1268.) Nowac would admit to being knowledgeable about the haypoint system, but not very knowledgeable, and that a Human Resources employee would be more knowledgeable than she. (R. 1268.) The haypoint system was only fully implemented at Bicron sometime in 1993. Unionized and hourly (a.k.a. exempt) Bicron employees were not part of the haypoint system. (R. 1269.) She believed that at all times she and Willing were paid within the salary range available to their common haypoint number of 464. (R. 1272.) She admitted that haypoint numbers do not correspond to specific dollar salaries, that there will be employees with the same haypoint numbers who have different salaries, but within the available salary range for the haypoint number, and that the higher the haypoint number the broader the available salary range. (R. 1273.) Next on cross-examination, Nowac changed her prior testimony with regard to her reasoning that she should have been paid the same as Willing; she now stated that this belief was based on their having the same haypoint number, the same job and the same job rating. (R. 1274.) She also, contrary to her earlier general testimony on direct examination, claimed that she got along with Mikolic. (R. 1275.) Nowac also stated that when she advertised for the position in her department that eventually was filled by Mr. Weaver following dozens of applications (at a salary greater than Deluga, who was Weaver's gender discrimination counterpart), Deluga asked about the position but did not apply for it. (R. 1277-1279.) Nowac then remembered that with her help and the help of Mr. Green, Deluga, in less than a year's time, received a couple of salary increases to boost her annual pay significantly, from less than twenty-thousand-dollars to thirty-thousand-dollars, and keep it more in line with Weaver's. (R. 1279-1283.) Nowac never recommended that Deluga get the boost in salary in relation to Weaver on the basis that Deluga was a female or on the basis of gender discrimination. (R. 1283-1284.) Also, Nowac was perturbed by Mikolic delaying her employee performance interview for a month (from January to February) in early 1995, she believing that she was treated differently than other employees, but acknowledged that she was not shortchanged in that she still received the full value of her salary increase that year like other employees. (R. 1298-1300.) She next admitted that she would not be surprised to learn that other employees, in particular Deluga, had had an employee performance interview delayed when Deluga worked for Mr. Green. (R. 1300-1301.) Nowac admitted that she was never denied a promotion at Bicron that she had applied for. (R. 1302.) She also knew that Quackenbush (the General Manager) made the ultimate decision as to which employee would be terminated at Bicron and that she was not part of the decision making process leading to the RIF. (R. 1303.)
On redirect examination Nowac testified that Willing and she had different job responsibilities when Willing was hired at Bicron and her responsibilities were greater than his, therefore she believed that he should not have been paid more than her when he was hired in mid-1992. (R. 1307-1309.) She did not suggest that Willing was overpaid during his tenure at Bicron, instead she believed that she was underpaid. (R. 1313-1314.) When she interviewed prospective employees, Nowac had no authority to set a salary and did not do so. (R. 1318.) She reiterated her earlier testimony that her termination, rather than Willing, was gender discrimination because she believed that they were equal having the same haypoint number, job title, responsibilities and perhaps qualifications; gender was the only reason she could think of to explain the decision to terminate her instead of Willing. (R. 1323.)
The twenty-first, and final, witness for the plaintiffs was Mr. Carr Lane Quackenbush, as if on cross-examination. (R. 1325.) The witness corroborated the fact that he was transferred by St. Gobain to Bicron as General Manager in January of 1991 and added that his services at Bicron terminated pursuant to an employment contract in June of 1996. (R. 1325-1326.) Bicron was an equal opportunity employer and had a policy prohibiting discrimination on the basis of gender, pay, minorities, etc. While at Bicron he had no knowledge that women were systematically being paid less than men. (R. 1328-1329.) Also, he was not aware while at Bicron of the specific gender breakdown for each particular 100-point level within the haypoint system. (R. 1329-1330.) He could not recall his exact bonus amount for any particular year, but that his 1995 bonus was approximately $125,000 and his prior years at Bicron were approximately $30,000 or less. The Management Incentive Program was not determined by one's particular salary. (R. 1337.) The witness agreed with the general characterization that the higher the operating income of Bicron the more favorable the impact on potential bonuses. (R. 1339.) Bicron's proposed budget (which was developed in December of 1994 and sent to St. Gobain for approval) for 1995 operating income was $9,700,000. In fact, operating income as of July 11, 1995, was still budgeted at $9,700,000 and this figure was reflected at the end of 1995 in the final budget figures. (R. 1340-1344.) Yet, a document prepared by Bicron during discovery, see Defendant's Exhibit I, titled "Bicron Actual Performance in 1994, Compared to the 1995 Budget," listed the operating income for 1995 as $10,700,000, which is approximately one-million-dollars greater than the earlier records. (R. 1344-1346.) The witness testified that drastic action in the form of employee terminations was necessary at Bicron to alleviate an economic crisis in 1995. (R. 1347.) In the seven-and-one-half months prior to the RIF, Bicron did hire or promote eighteen people and their salaries amounted to hundreds of thousands of dollars. (R. 1350-1355.) The witness took personal responsibility for the terminations, but he was not told by Mr. Kaufman that the terminations were overly weighted against female employees or that Kaufman felt there was no economic crisis in the company. (R. 1356.) Quackenbush also denied telling Kaufman that the reason for the RIF was to increase the 1995 bonuses. (R. 1356-1357.) In making his final decision as to who would be terminated, Quackenbush took into consideration the recommendations of the department heads. (R. 1359-1360.) At the time he approved of the RIF list he did not know the percentage of females to males who were terminated; that percentage breakdown was not a consideration. (R. 1361.) Kaufman, as Human Resources Director, never brought to Quackenbush's attention any problems with minority or female hiring, pay or advancement. (R. 1363-1364.) At that point the plaintiffs rested subject to admission of the exhibits. (R. 1365.)
The defense then questioned Quackenbush on direct examination. (R. 1366.) Quackenbush stated that he was not personally concerned with company EEO compliance because his primary responsibility was to look after the company's financial and strategic interests. Instead, he relied on Mr. Kaufman as Director of Human Resources to monitor and manage EEO compliance at Bicron's operations in the United States. (R. 1366, 1370-1371.) Quackenbush's educational background includes a Bachelors degree in ceramic engineering in 1964, a Master's degree in ceramic engineering in 1969, and a Doctorate degree in that subject in 1973. (R. 1372.) Following his doctorate degree, he taught briefly at a university in West Germany before working at GTE Laboratories in research from 1974 to 1983. From there he went into management at a production plant in Pennsylvania before being hired as a member of management at Norton Company in 1985 where he worked as a director of a joint venture with TRW Corporation. In 1990 Norton Company was acquired by St. Gobain. (R. 1374.) In 1991 he accepted an offer by St. Gobain to lead the Bicron affiliate and consolidate the operations in Newbury and Solon while increasing sales and profits. (R. 1375-1380.) In 1990 the Solon operation had been losing $2,500,000 per year for a five-year period, and the Newbury operation had a bad cash flow problem which prevented them from not even making payments to local merchants. (R. 1380-1381.) Each operation was producing approximately $21,000,000 in annual gross sales in 1990 and they were both losing money. (R. 1381.) Consolidating the Bicron operations, it was thought, would decrease costs, increase productivity, and increase efficiency while maintaining sales and increasing profits. The consolidation plan included concentrating similar product line operations at a particular plant which required personnel shifting between the two plants.[13](R. 1384-1386.) He also brought in new management personnel to improve, the skills and capabilities of the staff and employees so that they could improve performance in developing the products and services that were needed. (R. 1386-1387.) Since his arrival, through 1994, Bicron met its operating income projections even though the company increased projections each year. (R. 1393-1394.) Each month Bicron received financial statements relative to the budget so that they could gauge whether budget projections for the year were being achieved or not. All non-union employees, exempt (or hourly) and non-exempt (or salaried), benefitted when the company met operating income projections because those employees were on some type of bonus plan through which profits were shared. (R. 1395-1396.) During the first three months of 1995 Bicron was close to meeting the budget expectations, but were off "badly" in April by $100,000. (R. 1396.) In May of 1995 Bicron missed the budget projections for that month by $300,000, and June's projections were missed by $500,000. (R. 1397.) So, by June of 1995, the projections were off by $600,000. Kaczorowski, the Bicron's Chief Financial Officer, sounded the alarm bells relative to the financial shortcomings trend sometime prior to May of 1995. The company took steps internally to control costs and inventory, and increase the account receivables payments by customers. (R. 1397-1398.) The financial problem was transmitted to the employees indirectly by posting periodic statements of potential employee bonus payouts for 1995; the total available amount of the potential payout began to decrease in April of 1995 reflecting deteriorating overall profits. (R. 1399-1400.) The problem was not the cyclic nature of gross product sales, instead it was an out-of-control cost containment problem which negatively impacted the budget projections. (R. 1404-1405.) Another efficiency measure the staff examined was whether the departments had overstaffing in inadequately skilled individuals to do the job and whether overall staffing was in line relative to industry levels. (R. 1406-1408.) Quackenbush had a continuing objective of constantly improving the skills of his workforce so as to maximize efficiency and he believed that the engineering department was "badly unskilled" in light of the increasingly technical product line at Bicron. (R. 1408-1409.) To improve skills, he generally suggested to his staff level managers that they consider hiring and firing employees to achieve efficient skill levels. (R. 1411.) Initial reactions by the department managers were to protect their staffing, which frustrated and concerned Quackenbush. On July 15, 1995, with the cost control problem dogging his company, Quackenbush issued a confidential memo to his nine staff level managers in which he indicated that drastic measures were needed to address the cost problem and meet the budget projections for the year of 1995 and the departments were to effect a RIF, as proposed within the memo, which would be implemented by August 15, 1995. (R. 1413-1416.) The court then ruled on the admissibility of plaintiffs' exhibits and then the plaintiffs rested. (R. 1417-1418.)
The defense then made its motion for a directed verdict on all causes of action. (R. 1419.) Following oral argument the court denied the motion in its entirety except for the claim concerning retalition. (R. 1441.)
Next, the defense continued its examination of Quackenbush. (R. 1442.) The witness detailed the manner in which he and his staff made a number of spread sheets which proposed various additions and subtractions from staffing based on financial costs and skills in the various departments of the company, and that these proposed lists were revised several times to achieve the goals the General Manager had set out to do to cure the problems he viewed as being present in the company. He also recalled that Mr. Kaufman had raised issues about race and age considerations in the planned terminations and that Kaufman wanted to ensure that the downsizing was accomplished in a legal way and as humanly as possible for those subject to the terminations. (R. 1449.) These proposed RIF plan and termination lists were also distributed up the chain of command at St. Gobain, to Quackenbush's supervisor and to Kaufman's Human Relations superior. (R. 1454.) Some of the employees hired in the seven-and-one-half months prior to the RIF were replacements and some were new positions (some of which were anticipated prior to the planning for the RIF), so only some of them contributed to negatively impacting operating costs as new costs. (R. 1458.) He did not recall that the RIF planning hinged on a specific target number of employees to be included in the RIF. (R. 1460.) The final revision of the termination list was dated August 18, 1995. (R. 1461.) He made the ultimate decision, based in part on the accumulated data and recommendations of his staff directors, on who would be on the final termination list. (R. 1461-1462.) Quackenbush was personally concerned with Siemens Corporation's dissatisfaction with the Bicron Gamma Camera returns and its seal problems. He believed that Gliner was responsible for convincing Siemens that the customer supplied design was not in the customer's best interest and to sell the customer on a more creative approach supplied by Bicron. He did not believe that Gliner, and the engineering department, lacked initiative and was not being as creative as she/it should be to make the customer happy and finding a solution to the seal problem causing the returns. (R. 1465-1467.) The seal problem was cured after the RIF by Bicron, with the help of Mr. Herr, by revising the design for the customer. (R. 1467-1469.) Mr. Herr was hired in early 1995 because the engineering department lacked the skills Herr provided, namely, design quality and methodology, documentation, and computerized drafting in a three-dimensional environment. (R. 1469-1470.) The engineering and manufacturing departments were disproportionately affected by the RIF because these two departments represented the two largest departments in the company. (R. 1471.) It was Mr. Kaczorowski who recommended Nowac and Deluga for termination from the accounting department. (R. 1472.) Joiner, the Traffic Manager, was recommended for termination by either Kaczorowski or Mr. Tom Dome. The witness then examined the 1995 proposed budget for Bicron (which was prepared in late 1994) and the actual budget figures for 1995 (which was prepared in January of 1996) which he was confronted with by plaintiffs' counsel. (R. 1474-1483.) He explained the $940,000 difference in operating expenses between the two reports as being caused by St. Gobain's direction from France to revise the projection of operating expenses; St. Gobain believed that the projected operating expense figure was too low. The $940,000 operating expense contingency is reflected within line R-59 of the final closing statement for 1995's budget. (R. 1482-1483.) The $940,000 adjustment to operating expenses is also reflected on Bicron's July 11, 1995 Profit and Loss Statement (or Income Statement) at line R-59. (R. 1484-1485.) The 1995 operating income (or profit) goal for Bicron was $10,662,000, but they achieved only $10,224,000, a shortfall of $438,000 despite the RIF. (R. 1489.) Quackenbush denied that the motivation for the RIF was to enhance year-end bonuses for upper management. He learned that the corporate office, without influence from himself or Bicron, had made the decision in the Spring of 1995 that the percentage of the bonuses paid to upper level management would be increased in 1995 over prior years to make the upper level management salary package more competitive with the industry levels in general. (R. 1490-1492.) He also noted that the non-hourly employees at Bicron who were not in the Management Incentive Program still had their own incentive bonus plan which provided a bonus of up to 10% of salary and that this plan was affected in part by the profitability of the company. (R. 1495.) The witness then explained the haypoint system which is based on job descriptions and provides a salary range based on a banding of haypoint numbers. (R. 1497-1501.) To the best of his knowledge, no one at Bicron while he was there was paid below the minimum salary available to a particular haypoint number, and if this was so it was grounds for corrective action. (R. 1501.) The haypoint system was brought into the Solon system in 1992 or 1993. (R. 1502.) Eligibility for inclusion in the Management Incentive Program is based on one's haypoint number. (R. 1503.) In March of 1995, he and the senior staff managers received notice from the corporate main office that the minimum haypoint number for the Management Incentive Program was going to be lowered from 600 down to 575 and they were directed not to let the employees in the 575 to 600 range know about the impending change in the bonus plan eligibility until it was effected. (R. 1504-1505.) He did not have the authority to change anyone's haypoint number and this did not occur at Bicron to his knowledge. (R. 1507.) The fact of an employee being a female played no role in his decision to terminate them; instead, the termination decision was done on an individual basis. (R. 1507-1508.)
On further cross-examination by plaintiffs' counsel, Quackenbush generally reiterated his prior testimony. (R. 1509.) Significantly, plaintiffs' counsel pressed the witness to divulge a specific document which would support the witnesses assertion that the corporate main office was adding $940,000 to Bicron's projected operating expenses for 1995. The witness, without singling out a particular document, maintained his belief that the figures in the reports on line R-56 reflected the $940,000 revision. (R. 1510-1516.) The change in the minimum haypoint number for inclusion into the Management Incentive Program, which was implemented in 1996, automatically created openings for several female employees. (R. 1519-1520.) Under the Management Incentive Program, Quackenbush was eligible to receive a bonus of 120% of his salary. (R. 1525.) One male employee (Mr. Green) who had apparently not; reached the minimum haypoint number for inclusion into the Management Incentive Program in 1994 and 1995, prior to its change reducing the minimum, mistakenly received the bonus anyway while at least one qualified female (Ms. Keller) did not get the bonus; the reasons for which the witness could not explain. (R. 1533.) The average bonus in 1995 doubled, on average, for the members of the Management Incentive Program while the non-Program employees received bonuses of approximately $50 in 1995. (R. 1535-1538.) He did not believe that the receipt of Management Incentive Program bonuses in 1995 was inconsistent with there being an economic crisis at the company; he believed the two issues were not related. (R. 1538-1540.) It was his belief that Gliner had not performed her job in not convincing Siemens to alter the design of the problematic Gamma Camera design. (R. 1552-1554.) Although there appeared to be a cyclical pattern to Bicron's sales throughout the year, one could not rely upon the sales that were on order as a reflection of anticipated profits because customers could cancel or modify the orders until the order was released to the manufacturing department. (R. 1561-1567.) Even though the July 1995 monthly report gave the staff a prediction that Bicron would exceed the $9,700,000 in operating income by as much as two-hundred-thousand dollars by the close of 1995, the August RIF was still necessary due to an economic crisis. (R. 1567-1568.)
On redirect examination of Quackenbush, the witness explained that despite the July 1995 report and the prediction of several hundred thousand dollars in excess of operating income, this excess was based on a projection of $9,700,000 operating income in 1995. It did not account for the revised operating expenses of $940,000 which was directed to be used by the corporate main office. (R. 1570-1574.) The witness next testified that there was a corporate document which expressed this direction to include the $940,000 in Bicron's projections for operating expenses. (R. 1574.) He next reiterated that haypoint numbers were assigned by corporate managers outside Bicron. (R. 1584.)
On re-cross examination by plaintiffs' counsel, Quackenbush was again pressed to identify any specific document which would show that the main corporate office had directed him to revise his operating expense projection by an additional $940,000 for 1995. (R. 1588-1591.)
The second witness for the defense was Ms. Ruth Krolikowski, who is a Processing Engineer in Bicron's materials department. (R. 1594.) She has a 1985 Bachelors degree in Chemical Engineering and also has a 1994 Master's degree in Engineering. She had worked at Bicron for several years in the mid to late 1980's, but left because it was having severe financial problems and the company owners were trying to sell it; she left it in 1989 for employment at NASA Lewis. She rejoined Bicron in early 1994, in the newly created position at the Solon plant, after working at NASA Lewis from 1989 to 1994. She interviewed with a number of male managers at Bicron including Mr. Quackenbush. (R. 1596-1599.) Her 1995 salary was $51,360. (R. 1600.) In her opinion, there are less females than males in salaried positions at Bicron because males constitute an overwhelming percentage of engineering students and engineering professionals within the industry. (R. 1600.) While at Bicron she has not been treated differently because of her gender. Her supervisors, who were males, have also encouraged her to pursue moving into a management position at Bicron, except that she wants to pursue the technical side of engineering and has no interest in going into administration. (R. 1601-1603.) She, like Gliner, was also pregnant in 1995 and the males in mid and upper management were very supportive and caring toward her even though she missed work from May to mid-August of 1995. (R. 1603-1605.) In her opinion, Bicron management did not discriminate against female employees with respect to hiring, advancement opportunities, or promotions. (R. 1605.) On cross-examination, she stated that she traveled as part of her duties at Bicron and that having children was not an impediment to that duty. (R. 1609.) Her haypoint number in 1995 was 494. (R. 1614.) Some other employees at Bicron who had a haypoint number of 494 were paid more than her in 1995 while some other employees with a smaller haypoint number were also paid more than her. (R. 1615-1621.) She was not aware of that confidential information until presented with it at trial, but she stated that she was still satisfied with her own salary. (R. 1621-1622.) On redirect examination, the witness stated that she did not know exactly how the haypoint system worked except that a particular haypoint number did not translate to a certain salary in that the salary was linked to a haypoint banding range which translates to a range of salary available to a haypoint number, which explains the broad range of salaries within a band of haypoint numbers. (R. 1626-1627.) The haypoints of the employees which plaintiffs' counsel compared to hers were all within the same haypoint banding range. Likewise, all of the salaries of those employees, including hers, were within the range of available salaries for that particular haypoint banding. (R. 1628-1629.)
The third witness for the defense was Ms. Christine Keller, who is the Director of Marketing at Bicron and works out of the Newbury plant. (R. 1632.) Part of her duties include supervising the work of ten employees, two of whom are based in France, and also managing the engineer product line at Bicron. (R. 1632-1633.) She reports to the General Manager. Her education consists of a 1984 Bachelors degree in Chemical Engineering, an MBA in General Management, and continuing course work and seminars related to administration and management. (R. 1634.) She began working at Bicron in 1985 as a sales trainee and has held a number of different positions as she advanced in the company before leaving in July of 1989 for Uniroyal Chemicals because of financial problems with Bicron. (R. 1634-1636.) She returned to Bicron's Solon plant as a Sales Engineer approximately six months later in late 1989 because of a reorganization at the Solon plant and the urging of her former male supervisor at Bicron who now was in charge of that reorganization effort. (R. 1637-1638.) In 1994, after extensive traveling over a ten state region as a Sales Manager, she was promoted by Mr. Corvo to the newly created position of Senior Product Manager out of the Newbury plant, winning that job over a number of male applicants. (R. 1640-1641.) There were only four Product Managers in Bicron at that time and she was made the Senior Product Manager within that group of four. She was the only female of that four-person group and its supervisor. (R. 1643.) She became Director of Marketing in June of 1997, shortly before the trial, receiving an increase in haypoint numbers but not an increase in salary. (R. 1644.) As of June of 1995, while she was Senior Product Manager, her haypoint number was 611 and her salary was $77,280. (R. 1645.) She was notified in January of 1996 by Quackenbush that she was eligible for inclusion into the Management Incentive Program because she had achieved the minimum haypoint number for that program. (R. 1646.) She had received advance notice of the inclusion into the program in 1995 when Mr. Corvo, her supervisor at that time, had informed her that the management bonus program was being revised by the main corporate office by lowering the minimum haypoint number for eligibility. (R. 1646-1648.) She had met Gliner briefly sometime in late 1993 on a job related matter. (R. 1649.) Although Gliner had expressed an opinion to the witness at some time that gender discrimination was practiced at Bicron, the witness disagreed with that opinion. (R. 1650-1651.) The witness believed that Gliner was frustrated because she (Gliner) was in a male-dominated department where the males were banded together and she (Gliner) did not think that her male co-workers worked as hard as she (Gliner). (R. 1651.) The witness did not believe the video tape production was discriminatory to women. (R. 1652.) The witness once gave some advice to Gliner, that "she spent too much time worrying about being a woman, and she should spend more time doing her job." (R. 1653.) The witness considered this advice to be applicable to men as well. She did not think that women had to work harder than men, just that they should concentrate on doing the job they were hired to perform and paid to do. In August of 1995, the witness interviewed Gliner for a position as Product Manager which came open because the person then holding the job had been promoted. (R. 1654.) The job was posted internally and advertised outside the company. The educational requirement for the position was incorrectly stated in the original posting when it did not mention that an MBA degree, in addition to a Bachelors degree in Engineering, was required. The defective posting caused the position to be re-posted with the correct requirement of an MBA. (R. 1655-1657.) This position was ultimately filled by the company in October of 1996, more than a year after the RIF, after a national search using a head-hunting search firm which produced approximately seventy to eighty applicants, of which forty to fifty were interviewed. (R. 1657-1659.) In the entire number of applicants for that position, only two females applied, one of whom was Gliner, and another lady from Connecticut who was interviewed. (R. 1659.) The simple fact explaining the paucity of female applicants is that there are not many females in the engineering field; it's the nature of the business. (R. 1660.) During Gliner's interview with the witness, and despite the interviewer explaining the goal for the new position and why the heightened education requirement was necessary for the position, Gliner expressed hostility to the MBA requirement because she (Gliner) thought there were other employees in the department without MBA degrees. (R. 1661.) The applicant who was eventually hired to fill the position was a male, Mr. Mike Lopez, who was initially interviewed in September of 1995 by the witness and who had a Bachelors degree in Engineering from The Massachusetts Institute of Technology and an MBA degree from The University of Michigan, and work experience in both Market and Product Management in the imaging field; he was an excellent fit for the company's goals. (R. 1662.) A week after his interview, Lopez had taken a job at Picker International, but after he had seen the position advertised a year later he called the witness and asked if he could still be considered for the position. The witness was thrilled with her good fortune in finding him available and moved quickly to secure Lopez's services for Bicron, hiring Lopez within thirty days. (R. 1662.) Corvo did state his belief that females make better Product Managers, but the witness took it as a compliment, interpreting the remark in the manner it was intended, that females are better at building teams to accomplish a mission despite the Product Manager having no authority to compel anyone in the company outside their product group to do something for them; to paraphrase, females are better at working with varied people and getting cooperation for a goal. (R. 1663-1664.) In twelve years in the industry, the only females she has encountered in a technical situation have been graduate students. On the other hand, her encounters in the same time frame with purchasing personnel in the industry have been approximately 40% female. (R. 1665.) She does not feel women are discriminated against at Bicron and has never heard Mr. Corvo say that women are better at straight-line thinking than men; it is her opinion that Corvo is supportive of women in the workplace and that he believes that women can perform any job. (R. 1665-1666.)
On cross-examination, Keller stated that she is not married and has no children. (R. 1667-1668.) She has never worked in the industry as an engineer. Besides her boss and herself, she did not know who participated in the Management Incentive Program or what their haypoints were. (R. 1671, 1680-1681.) She never heard Corvo say that women are less confrontational than men. She does believe that creativity is needed in an engineer. (R. 1676-1677.) She was unconcerned with the prospect of her not participating in the Management Incentive Program while men with lower haypoints participated and did not view such an action as gender discrimination. (R. 1684-1686.) If Mr. Corvo would ever tell the witness that she looked like a woman but acted like a man, which he did not do to anyone according to the witness, the witness would take it as a compliment. (R. 1696-1687.) She would find it inappropriate if any manager would tell a woman that pregnancy would adversely affect the woman's ability to perform her job. (R. 1688.) She denied ever telling Gliner that she (Keller) had experienced discrimination at Bicron. (R. 1690-1691.) She may have told Gliner that she (Keller) thought that two of her (Keller) male subordinates had trouble reporting to her (Keller) because she was a woman. (R. 1692.) When the witness interviewed Gliner, Gliner was interested in being a Product Manager for a medical device product line which Keller supervised, not the Product Manager of the Gamma Camera line which was ultimately filled by Mr. Lopez. (R. 1693-1695.) The Product Manager position for the medical device line was ultimately filled by Mr. Tim Parker; a position she preferred to fill with a person possessing an MBA degree, which Mr. Corvo did not have. (R. 1695.) It was Keller's sole decision to not recommend Gliner for the Product Manager position for the medical devices line and that decision had nothing to do with her lack of an MBA degree. (R. 1696.)
The fourth witness for the defense was Mr. Edward Kaufman, who generally reiterated his earlier testimony. (R. 1702.) As the head of Bicron's Human Resources Department in early 1995, he did not have any decision as to whether a RIF would be done, but was involved in the planning for the RIF. (R. 1704.) The General Manager, Mr. Quackenbush, had the ultimate decision for the RIF and who would be terminated in it. His primary role in his position was to act as a devil's advocate during the RIF planning to make sure that potential discrimination was not a factor in the decision making. (R. 1704-1705, 1738-1740.) As he recollected, the possibility on a RIF was first discussed in early 1995 due to budgetary problems. Alternatives to terminations were looked at in the early discussions. (R. 1705-1706.) The financial situation and budget figures were not his concern; he did not understand the financial aspect of the company, which was the responsibility of the General Manager and Mr. Kaczorowski. (R. 1706.) In the later planning stages for the RIF, when it became more certain that terminations would be performed, he used his position to ensure that the RIF was non-discriminatory and none of the terminations, in his view and what he advised Quackenbush at the time, had a discriminatory basis. (R. 1707, 1712-1715, 1736, 1740.) He corroborated Quackenbush's testimony relative to the planning for the RIF and the involvement of the senior staff members. (R. 1708.) Despite his leaving Bicron prior to the RIF, the witness wanted to be on the scene to personally help handle the terminations when they did occur. (R. 1709.) The vast majority of the exempt (or non-salaried) positions at Bicron were technical in nature and the vast majority of the job applications in any given year were by male applicants despite his constant efforts to recruit females. (R. 1716-1718.) After his leaving Bicron, he did speak to Gliner and to attorney Cohn, who passed himself as representing Gliner in a potential action against Bicron. (R. 1719.) The witness explained the RIF decision to Cohn and told him that he thought there was no basis for a gender discrimination action. (R. 1719-1721.) The witness also denied telling Cohn, Gliner and Mr. Brown that he (the witness) disagreed with the reason why Bicron put any of the four plaintiffs on the termination list, or that he (the witness) was outraged that any of the plaintiffs had been included on the termination list, or that he (the witness) had said the RIF was done in a discriminatory manner. (R. 1721-1723, 1737-1738.) However, the witness did admit to having told Cohn that he questioned Quackenbush on the economic necessity for a RIF; the witness was not totally convinced that a RIP, in general terms, was needed and that he believed, without having the financial information before him that Quackenbush had, that the company could somehow weather the economic crisis without resorting to a RIF. (R. 1723-1724.) There had been prior RIF's at the Solon plant and the witness left Bicron because he did not enjoy the prospect of going through the human suffering involved in a RIF and his health was suffering at the time; he was starting to feel worn down. (R. 1724.) All the people terminated were competent and capable employees. (R. 1725.) During his career he has laid off approximately one thousand people. The manner in which the RIF was planned and executed by management was the proper way to do it according to the witness. (R. 1726.) The severance package for each terminated employee, which included outplacement services which itself is unusual at Bicron, was based on the individual employee's years of service with the company. (R. 1728.) The witness's motivation in meeting with plaintiffs' counsel and Gliner after the RIF was to explain the RIF and discourage the need for a lawsuit because the witness did not want to be involved in a lawsuit. (R. 1731.) There was no further cross-examination of this witness by plaintiffs.
The fifth witness for the defense was Mr. Douglas Kaczorowski, who was Bicron's Financial Director for the Crystals and Detector Section at the time of the trial. (R. 1744.) His education includes a 1977 Bachelors degree in Accounting and a 1980 Master's degree in Accounting, followed by an MBA degree in the late 1980's. At the plant in Newbury, where he was hired in 1989, he was an Assistant Corporate Controller who managed the corporate accounting department where he supervised at least six subordinates. (R. 1745.) At that time he reported to Ms. Sandra Scott, a Chief Financial Officer located in an office in Louisville, Kentucky. (R. 1746.) Eventually, the Newbury and Solon plants were acquired by St. Gobain and the operations of the two plants consolidated under the management and leadership of Mr. Quackenbush. He came to Bicron in early 1992 as International Business Controller, managing the entire accounting department and purchasing at Bicron, and reported to Quackenbush. (R. 1750-1752.) In early 1992, the director of accounting at the Solon plant was Mr. Dan Mikolic and the director of accounting at the Newbury plant was Mr. Hacy Green. (R. 1752.) The consolidation of the operations of Bicron, which took several years to fully accomplish, necessitated the merging of the two accounting departments into one department covering the whole operation of Bicron. (R. 1753-1754.) In early 1993, the consolidation effort affecting the sale of the Gamma Camera production line from Solon to Newbury caused the permanent lay-off of twenty employees. (R. 1754.) The consolidation also prompted Bicron to install a new IBM computer system for accounting functions. (R. 1755.) Almost everyone was offered a combination of in-house and off-site training in the new system, including Willing, Green, Deluga, Nowac and Mr. Luther. (R. 1756.) Mr. Mikolic was in charge of that training program. According to the witness, no member of the Accounting Department, including Deluga and Nowac, was ever precluded from training on the new system. (R. 1757.) The witness also corroborated the earlier testimony of senior management personnel relative to the economic crisis affecting the company in 1995, the St. Gobain decision to revise the projected operating expense amount for 1995 by an additional $940,000 in a memo issued in late 1994 (see R. 1769), the decision making by management for the RIF and the employee composition of the termination list, and the decision to reduce operating costs and improve efficiency by reorganizing departments so as to enhance the skills mix of the employees remaining in the departments. (R. 1757-1823.) The witness decided to keep Deluga and Nowac on the termination list because of their lack of skills in relation to the efficiency of the accounting department; it was his decision that the department could more easily absorb their responsibilities into the organization since the remaining employees had stronger skills than these two employees. (R. 1795-1798.) It was not until Quackenbush released a memo containing the entire termination list to his department heads on August 3, 1995, that the department heads now were appraised of the full extent of the RIF and who would very probably be terminated on August 15, 1995; up until that date the department heads had only been involved in discussions regarding proposed terminations for their particular department. (R. 1801-1802.) In comparing Nowac to Willing, the witness considered Willing's computer skills and cost accounting skills background to be superior to that of Nowac's, and he considered Nowac as having a managerial style which was, at times, somewhat confrontational exhibiting a lack of diplomacy. (R. 1808.) After the RIF, Nowac's responsibilities in the accounting department were divided between Ms. Sherry Genske and Mr. Mikolic, and no one has been hired to fill her former position. (R. 1809-1810.) With regard to a comparison between Deluga and Mr. George Luther, the witness considered the fact that Luther had twenty-five years of experience with the company and had work experience with the computerized financial reporting system, inventory and capital expenditures; the witness noted that Deluga had not worked on inventory or capital expenditures, and thought that Deluga was capable of learning that computerized reporting system, but he did not have the time to train her at the time of the crisis and still achieve his department's budget goals. (R. 1811-1812.) Joiner was recommended for termination by Mr. Tom Dome and her position was eliminated because she had succeeded in achieving cost saving opportunities in shipping in 1994 and it was thought that these savings were up-front in nature and could not be replicated in future years.[14](R. 1814-1818.) Mr. Hayhurst, as opposed to Joiner, was not terminated because he had over twenty years of experience in shipping and receiving and was a working supervisor by packing the product and physically shipping the product out the door. (R. 1819.) Joiner's responsibilities after the RIF were divided between Ms. Ruth Jackson and Hayhurst; there exists no Traffic Manager position per se at Bicron. (R. 1820.) The witness was adamant that gender played no role in the RIF. (R. 1822-1823.)
On cross-examination, Kaczorowski generally restated his prior testimony. (R. 1823.) In particular, the witness reiterated his testimony concerning the St. Gobain decision to add $940,000 to Bicron's operating expenses for the 1995 budget. (R. 1835-1836.) The witness denied telling Mr. Weaver that he (the witness) thought that women were inferior to men in the workplace and that they should be subservient to men. (R. 1844-1845.) of the seven subordinates who reported to him, four were male and three were female (including Deluga and Nowac), but gender never entered his mind as a factor in the terminations. (R. 1849-1850.) He was not aware in 1995 that Deluga and Nowac had a history of cost accounting experience prior to their coming to Bicron. (R. 1850-1851.) He did not recall a conversation with Mr. Brown concerning Joiner's rate of pay being too low, nor was he aware of Mr. Scott allegedly complaining about Gliner's rate of pay being too low; the reason for such is that he did not get involved with salary issues of employees who were outside his department. (R. 1858-1861.)
On redirect examination, the witness confirmed that Mr. Weaver stopped doing cost accounting at the beginning of 1994. (R. 1873.) Nowac had an adversarial style in her interactions with management, and the witness received complaints regarding this perceived problem from others, yet he received no such complaints concerning Mr. Willing's style of interaction. (R. 1876-1877.)
The sixth witness for the defense was Ms. Donna Lashchuk, Bicron's Director of Human Resources at Newbury. (R. 1881.) Her counterpart at Solon is Ms. Cathy Gill, and both of them report to Mr. Gerald Joyce, the successor to Mr. Kaufman. The witness has approximately nineteen years of human resources work experience. She first learned of the planned RIF several days before August 15, 1995, when Mr. Kaufman informed her of the details. (R. 1885.) Prior to her learning, she had no involvement in the planning for the RIF by management. When she interviewed Nowac for her starting position at Bicron, Nowac stated that her salary demand was $25,000 yearly (an increase of $2,000 over the amount Nowac had been making at the Internal Revenue Service), which is what Bicron gave her to obtain her services. (R. 1896.) The witness next corroborated the fact of Nowac's regular merit pay increases. (R. 1897.) Prior to Bicron, Mr. Willing was making $43,400 annually at a St. Gobain company in Delaware. When Mr. Willing was hired at Bicron in 1992, he maintained his salary of $43,400, plus an increase of $3,930 per year according to a company policy for lateral moves, and was paid a relocation expense of 5% of base salary according to the same lateral move policy. In 1992 Nowac was earning $40,767, and was earning $47,988 in 1995. (R. 1897-1900.) The salary differential between Willing and Nowac was based in large part upon Willing's pre-Bicron salary. (R. 1901.) Nowac complained on a very regular basis concerning her pay, every other day or so, but Nowac's pay complaints were never based on gender or discrimination. (R. 1902.) Likewise, when Mr. Green asked the witness to help him adjust Nowac's pay, Mr. Green never mentioned gender as a basis for the increase. (R. 1903.) The witness was also involved in the hiring process involving Deluga, remembering that prior to Bicron, Deluga was earning approximately $13,000 per year and that she started working as an hourly employee at Bicron earning $15,000 per year in 1988. (R. 1905-1906.) From 1988 to January of 1992 when Deluga was promoted to a salaried position, her annual salary grew to $27,000. In July of 1992 Deluga's salary increased to $30,000 per year through the assistance and lobbying of Deluga's supervisor (Nowac). (R. 1907-1908.) Neither Deluga nor Nowac, in lobbying the witness for an increase in Deluga's pay, ever used gender discrimination as a basis. (R. 1908-1909.) In 1995 Mr. Luther was earning approximately $10,000 more per year than Deluga, a differential which was explained by the witness as being caused by Luther's more extensive job experience and having many more years of service with the company than Deluga. (R. 1910.) The job duties of Messrs. Luther and Weaver were not the same as that of Deluga's position. (R. 1912-1913.) The witness then corroborated the pay history and various positions held by Joiner at the company. (R. 1914-1916.) She noted that it is not unique in the company that a subordinate is paid more than the supervisor, particularly where the subordinate has a long service history with the company as compared to the supervisor, and she gave a half-dozen examples of this practice. (R. 1917-1922.) When Mr. Brown asked for help in adjusting Joiner's salary with reference to Mr. Hayhurst's, he never mentioned gender discrimination as the basis for the adjustment. (R. 1922.) The witness also reviewed the 1995 document which contained the employees' haypoint numbers and noted that the corrections to specific employees' haypoint numbers, such as Joiner's haypoint reflecting a one-hundred point difference, was done to correct typographical errors or mistakes in transcription; Joiner's haypoint number was never changed by the company to a lower number. (R. 1924-1929, 1968-1969.) The witness then compared Gliner's salary history, noting that Gliner started working at Bicron in 1990 at a salary of $28,000 annually and that Gliner's salary at the time of the 1995 RIF was $38,400. (R. 1930.) Gliner never complained to the witness about unfair pay based on gender discrimination. (R. 1930-1931.) One of Gliner's supervisors, Mr. Scott, did talk to the witness about adjusting Gliner's pay relative to other engineers within the industry based on geographic regions, but gender was not made an issue. (R. 1931-1933.) In her entire tenure at Bicron, no employee has ever complained to her that they were treated differently on account of their gender. (R. 1934.)
On cross-examination, Ms. Lashchuk generally reiterated her prior testimony. (R. 1935.) It was her opinion that Kaufman was more qualified than she to become overall Director of Human Resources at Bicron. (R. 1937.) She also denied saying that Bicron was deficient in promoting or advancing females and minorities. (R. 1956-1957.) Joiner's haypoint number of 268 did not change when she took the position of Traffic Manager in January of 1995. (R. 1963-1964.)
At this point the defense rested its case subject to a proffer of, in part, documentary evidence which had been the subject of a pretrial motion in limine and also had been attempted to be introduced during the testimony of Quackenbush and Kaczorowski. (R. 1970-1977.) That piece of evidence was Defendant's Exhibit W, a two-page facsimile transmission dated December 1, 1994, from St. Gobain in France to Bicron, directing the Bicron management to revise its projected budget for 1995 by $940,000. The defense then renewed its motion for a directed verdict on the causes of action and the prayer for punitive damages. (R. 1978-2004.) The court denied the motion in its entirety except to dismiss Quackenbush as a defendant.[15](R. 2005.)
The court then entertained lengthy closing arguments by the parties see R. 2005-2139) before instructing the jury (R. 2140-2187). The jury returned the following verdict in favor of plaintiffs:
 1. As to Gliner, a 6 to 2 jury vote in her favor on: her claim of gender discrimination in her pay and termination; her award of $75,000 in compensatory damages; and, giving her attorney fees. Seven members of the jury voted in favor of awarding her punitive damages, but only six voted to award $200,000 as punitive damages.
 2. As to Joiner, seven members of the jury voted in her favor on her claim of gender discrimination in her pay. The jury found for the defense on her claim of gender discrimination in her termination. Seven members of the jury voted to award her $20,000 in compensatory damages and an award of $140,000 as punitive damages. Six members of the jury voted to give her her attorney fees.
 3. As to Deluga, seven members of the jury voted in her favor on her claim of gender discrimination in her pay. The jury found for the defense on her claim of gender discrimination in her termination. Seven members of the jury voted to award her $50,000 in compensatory damages and an award of $100,000 as punitive damages. Six members of the jury voted to give her her attorney fees.
 4. As to Nowac, six members of the jury voted in her favor on her claim of gender discrimination in her termination and pay. Six members of the jury voted to award her $50,000 in compensatory damages. Seven members of the jury voted to award $500,000 as punitive damages. Six members of the jury voted to give her her attorney fees.
In summary, the compensatory damages totaled $195,000 and the punitive damages totaled $940,000.
Subsequent to the verdict, the trial court awarded prejudgment interest of 8% on the compensatory damage award only, and assessed attorney fees of $175,000, predicated on the punitive damage award, in favor of plaintiffs. Also, the trial court denied defense motions for judgment notwithstanding the verdict, remittitur and new trial.
This appeal by St. Gobain presents four assignments of error. No cross-appeals have been filed by plaintiffs-appellees. The assignments will be addressed in an order other than that presented by appellant.
 III PUNITIVE DAMAGES ARE UNAVAILABLE UNDER R.C. 4112.99; THERE WAS NO EVIDENCE TO SUPPORT THE PUNITIVE DAMAGES AWARD.
The first subpart of this assignment, whether punitive, or exemplary, damages are available in actions brought pursuant to R.C. 4112, et seq., is without merit. The Ohio Supreme Court recently determined that such damages are recoverable in R.C. 4112 civil employment discrimination actions. See Rice v.CertainTeed Corp.(1999), 84 Ohio St.3d 417, syllabus.
With regard to the second subpart of this assignment, we note that Rice, at 422, determined that punitive damages are recoverable in R.C. 4112 actions "upon evidence of actual malice . . ." The demonstration of "actual malice" must be evidenced by either of the following: (1) hatred, ill will, or a spirit of revenge against the victim; or, (2) a conscious disregard for the rights of others which also had a high probability of causing substantial harm to the victim. Calmes v.Goodyear Tire Rubber Co.(1991), 61 Ohio St.3d 470; Preston v.Murty(1987), 32 Ohio St.3d 334, syllabus. In addition, the "conscious disregard" form of actual malice requires a showing of action beyond mere intentional negligence; instead, "conscious disregard" imparts outrageous, flagrant or criminal conduct by the perpetrator. See Bryans v. English Nanny School(Cuyahoga, 1998), 117 Ohio App.3d 303, 317.
In the case sub judice, this writer is hard pressed to discern any conduct on the part of St. Gobain, or Quackenbush, which would even remotely rise to a level characterized as hatred, ill will, revenge, or conscious disregard for the rights of the putative victims either in pay or termination. In fact, the directed verdict in favor of Quackenbush, which obviates a discriminatory animus on his part in the claims brought by plaintiffs-appellees, supports the belief that actual malice was not present in this case. Likewise, actual malice is minimized by virtue of the fact that the jury found for the defense on the claims of gender discrimination in the termination of Deluga and Joiner. As to alleged discrimination in the disparity of pay between the female plaintiffs and their particular male counterparts, none of the women could point to anything other than hunches and speculation when asked to provide a reason for that disparity in wages. To a woman, each opined in general during their testimony that the reason for the pay disparity had to be because they were women; that nothing else could explain it. Yet, the defense, in rebuttal to the pretext presented by plaintiffs, did provide a gender neutral explanation for the pay disparity between plaintiffs and their male counterparts: the jobs and/or responsibilities were not equal; prior work experience differed; education differed; prior pay history influenced what the company had to pay the male to entice that person to come to Bicron; skill levels were different; inducements to work for Bicron and tenure with the company, etc. This does not sufficiently support an instruction on punitive damages because actual malice was not demonstrated by the evidence.
The third assignment of error is well taken and the punitive damage award is vacated.
 I APPELLANT WAS ENTITLED TO A DIRECTED VERDICT OR A JUDGMENT NOTWITHSTANDING THE VERDICT ON GLINER'S AND NOWAC'S DISCRIMINATORY DISCHARGE CLAIMS.
We are guided in our procedural review, in part, by the following excerpt from Madera v. Satellite Shelters, Inc.(August 12, 1998), Cuyahoga App. No. 73172, unreported, 1998 Ohio App. LEXIS 3726, at 3-4[16]:
 Initially we note that the standard of review for a ruling on a motion for judgment j.n.o.v. is the same one applicable to a motion for a directed verdict. See Posin v. A.B.C. Motor Court Hotel(1976), 45 Ohio St.2d 271, 344 N.E.2d 334; Bruggeman v. Fishbaugh
(1994), 96 Ohio App.3d 200, 644 N.E.2d 1051. A motion for directed verdict is to be granted when, construing the evidence most strongly in favor of the party opposing the motion, the trial court finds that reasonable minds could come to only one conclusion -and that conclusion is adverse to such party. Civ.R. 50(A)(4); Crawford v. Halkovics(1982), 1 Ohio St.3d 184, 438 N.E.2d 890; The Limited Stores, Inc. v. Pan American World Airways, Inc.(1992), 65 Ohio St.3d 66, 600 N.E.2d 1027.
 Stated differently, a directed verdict is appropriate where the party opposing it has failed to adduce any evidence on the essential delements of the claim. Cooper v. Grace Baptist Church(1992), 81 Ohio App.3d 728, 734, 612 N.E.2d 357. The issue to be determined involves a test of the legal sufficiency of the evidence to allow the case to proceed to the jury, and it constitutes a question of law, not one of fact. Hargrove v. Tanner
(1990), 66 Ohio App.3d 693, 695, 586 N.E.2d 141; Vosgerichian v. Mancini Shah Associates, et al., 1996 Ohio App. LEXIS 788 (Feb. 29, 1996), Cuyahoga App. Nos. 68931 and 68943.
 R.C. 4112.02(A), which sets forth unlawful employer discriminatory practices, states that it is:
 An unlawful, discriminatory practice for any employer, because of the race, color, religion, sex, national origin, handicap, age or ancestry of any person to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions or privileges of employment, or any matter directly or indirectly related to employment.
 In Ohio, "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000 (e) et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." Little Forest Med. Ctr. v. Ohio Civ. Rights Comm.(1991), 61 Ohio St.3d 607, 609-610, 575 N.E.2d 1164, quoting Plumbers Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.(1981), 66 Ohio St.2d 192, 196, 421 N.E.2d 128; Neal v. Hamilton Cty.(1993), 87 Ohio App.3d 670, 676-677, 622 N.E.2d 1130.
Thus, in order for Bicron to prevail on its motion for directed verdict, the court, after viewing the evidence in a light most favorable to the non-moving party, reasonable minds could come to no other conclusion than that the reasons offered by Bicron for the RIF were non-discriminatory. See Civ.R. 50(A)(4). Because a motion for directed verdict tests the legal sufficiency of the evidence, which is a question of law, our review of the trial court's ruling is de novo. Howell v. Dayton Power Light Co.
(1995), 102 Ohio App.3d 6, 13.
In civil rights employment discrimination cases a burden shifting procedure is initially utilized. This procedure, enunciated in McDonnell Douglas Corp. v. Green(1973),411 U.S. 792, 98 S.Ct. 1817, 36 L.Ed.2d 688, consists of a three-part process of burden of proof shifting. First, plaintiff must establish by a preponderance of the evidence a prima facie case of discrimination, thereby creating a rebuttable presumption that the defense unlawfully discriminated against the plaintiff. If plaintiff establishes a prima facie case, the burden then shifts to the defense to produce evidence which, taken as true, establishes a legitimate, non-discriminatory reason of the adverse action. If the defense carries its burden of production, the prima facie case is rebutted and becomes irrelevant and drops from the case, see, St. Mary's Honor Center v. Hicks(1993),509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407, and the burden then shifts back to the plaintiff to present evidence that the non-discriminatory reasons advanced by the defense for the terminations were merely a pretext. It is noted that plaintiff retains the ultimate burden of persuading the trier of fact that she had been the subject of intentional discrimination.509 U.S. at 507, 113 S.Ct. at 2747-2748, quoting Texas Dept. of CommunityAffairs v. Burdine(1981), 450 U.S. 248, 256, 101 S.Ct. 1089,1095, 67 L.Ed.2d 207. It is also noted that plaintiff must not only demonstrate that the defendants offered reason was a pretext, or false, plaintiff must still demonstrate "that discrimination was the real reason." Hicks, 509 U.S. at 515,113 S.Ct. at 2752. In short, plaintiff must establish intentional discrimination by a preponderance of the evidence to prevail. Id. at 519.
In the present case, Gliner and Nowac claimed that their termination during the 1995 reduction-in-force, or RIF, was motivated by gender discrimination. In order to present a prima facie case for gender discrimination in situations involving a RIF, plaintiff in this case must establish the following: (1) that she is a member of the protected class covered by Title VII or its Ohio equivalent; (2) that she was discharged; (3) that she was qualified for the position; and, (4) that she must offer direct, circumstantial, or statistical evidence tending to indicate that the defendant singled her out for discharge for impermissible reasons. Anderson v. Premier Industrial Corp.(6th Cir., 1995), 62 F.3d 1417, 1995 U.S. App. LEXIS 23153, at 10-11;Ailor v. First State Bank of Maynardville(6th Cir., 1991.), 940 F.2d 658, 1991 U.S. App. LEXIS 18885, at 18-19.
Nowac and Deluga made a prima facie case for sex discrimination in that they were women, who were arguably qualified for their jobs and discharged, and who offered indirect circumstantial and statistical evidence that they were chosen for termination because of their sex.
The defense, positing financial crisis or economic necessity, offered a legitimate, non-discriminatory reason for the RIF.
Plaintiffs, in accord with their burden under McDonnell, then sought to demonstrate that the reason for the RIF, i.e., financial crisis or economic necessity, was false and a pretext for discrimination. Plaintiffs based the pretext on the theory that there was no true economic necessity for the RIF, that the financial crisis was a charade to obfuscate the true intent of the terminations which was to increase the annual year-end bonuses to Bicron's upper management through the elimination of employees and by manufacturing a phantom $940,000 revision in projected profits for budget year 1995.
The methods used by plaintiffs to demonstrate this alleged pretext for the terminations include: (1) alleged oral statements, arguably sexist in nature, attributed to Messrs. Kaufman, Corvo and Kosuth; and, (2) statistical evidence offered by Dr. Rosen and Nowac.
As to the oral statements of the three men which allegedly demonstrate an underlying atmosphere of gender discrimination directed toward women employees at Bicron, it is noted that Quackenbush, the General Manager of Bicron who made the final decision as to who would be terminated in the RIF and had access to all of the relevant personnel records and job performance materials for each employee and financial data for each department, did not author or condone the comments. There is no evidence that these subordinates concealed relevant information from Quackenbush or provided him with false data in an attempt to manipulate Quackenbush's decision relative to any of the terminations. Accordingly, the effort to build a prima facie case of discrimination, let alone establish a pretext, from the comments of these non-decision maker subordinates, is without merit. See, Wallace v. SMC Pneumatics, Inc.(7th Cir., 1997),103 F.3d 1394, 1399. Also, the fact that Quackenbush was dismissed from the case by the court at the close of the defense case-in-chief signals that his ultimate decision as to which employees would be terminated was a gender neutral decision. Thus, for the sake of consistency, the trial court should have granted a directed verdict at that time on the termination claims, too, or grant the motion for JNOV on the termination claims after the verdict.
Apart from the analysis contained in the preceding paragraph, the statements attributed to Kaufman, Bicron's former Director of Human Resources, present a particularly noxious evidentiary problem which permeates the termination and pay claims and must be explored. Prior to the commencement of the trial, the defense made a motion in limine to: (1) preclude inadmissible hearsay testimony concerning statements attributed to Kaufman which would show Kaufman harbored gender discrimination concerns at Bicron in general and in the planning for the RIF, and that the RIP itself was not needed because there allegedly was no financial crisis; and, (2) preclude the plaintiffs from impeaching Kaufman's testimony pursuant to Evid.R. 607 after calling him as a witness on cross-examination during plaintiffs case-in-chief. The trial court granted the motion with respect to the hearsay issue, but denied it with respect to the impeachment argument. During plaintiffs' case, and over the objection of the defense who renewed its motion in limine with respect to the impeachment argument just prior to Kaufman taking the stand for plaintiffs, Kaufman was called on cross-examination and his testimony was later impeached by subsequent plaintiffs' witnesses over the renewed objections of the defense and, despite the court's earlier ruling and over the objection of the defense, the court permitted the hearsay evidence to be elicited by the plaintiffs.
In calling Kaufman on cross-examination during plaintiffs case, plaintiffs had to have known that his testimony would be adverse to their version of the facts; there was no surprise demonstrated in his anticipated adverse testimony. Evid.R. 607 expressly forbids impeaching the credibility of a witness by means of a prior inconsistent statement except where it is shown that the witnesses' testimony is a surprise and affirmative damage results. The Staff Note to Evid.R. 607 makes clear the point:
 Rule 607 abolishes the general principle, preserving the "voucher rule" in those limited cases in which impeachment by the party calling the witness is predicated upon a prior inconsistent statement unless surprise and affirmative damage can be shown. Otherwise, the party would be entitled to call a known adverse witness simply for the purpose of getting a prior inconsistent statement into evidence by way of impeachment thus doing exactly what he could not have done directly.
Permitting the plaintiffs to impeach the cross-examination testimony of Kaufman, their own witness, through the inconsistent statements attributed to him by subsequent testimony of plaintiffs' witnesses was in clear violation of Evid.R. 607. This error permitted plaintiffs to introduce a number of times through a series of witnesses, hearsay evidence concerning Kaufman's alleged statements relating to gender discrimination at Bicron, the lack of a true financial necessity for the RIP, and an impermissible animus in the selection of the employees who would be terminated. The error infected the trial and seriously calls into question the resulting verdicts.
A second, and equally prejudicial, evidentiary error committed by the trial court was the failure to permit the introduction of Defendants Exhibit W which was the memo from St. Gobain to Bicron directing upper management to revise the 1995 projected budget by $940,000. This memo corroborated testimony by a number of Bicron employees as to the foundation and legitimacy of the $940,000 revision, which downward revision gave life to the decision making by upper management to cut costs and improve efficiency and skills, which ultimately led to the RIP. Plaintiffs' counsel, during cross-examination of management witnesses, repeatedly questioned the particular witness as to whether they had any specific document to demonstrate that the $940,000 revision was mandated by St. Gobain in France and was anything other than a manufactured manipulation of company records. Plaintiffs counsel, during closing arguments, made mention of this lack of documentary evidence specifically detailing the revision. This memo, Defendants Exhibit W, was listed as an exhibit in defendants pretrial exhibit list which was served on plaintiffs prior to trial. The trial court never gave a reason for prohibiting the admission of the exhibit during trial. The memo was highly relevant to the company's non-discriminatory reasons for the RIF and should have been admitted, particularly after plaintiffs' counsel argued the lack of such a document during cross-examination and closing argument.
Despite the improper impeaching of Kaufman's testimony by plaintiffs witnesses using hearsay evidence, the fact remains that Kaufman was not the person who made the ultimate decision to terminate the employees in the RIF and it was not demonstrated that Kaufman improperly influenced Quackenbush with misleading information so as to steer Quackenbush in his selection process. To the contrary, in his Human Resources role prior to leaving Bicron Kaufman made every attempt to ensure that the RIF was benign in terms of discriminatory motive. There is no doubt that Kaufman did not influence the preparation of the RIP in its final stages prior to being enacted because he left Bicron several months before the RIF took place. Thus, his putative inconsistent statements, even if true, are not direct evidence of a discriminatory motive by the decision maker. Wallace v. SMCPneumatics, Inc., supra.
The statistical evidence presented by plaintiffs attempted to show that female employees at Bicron, as a group, were disproportionately impacted by the RIF in relation to their male employee counterpart group. The raw data indicates that a total of 23 employees were terminated as part of the 1995 RIF. Defendants Exhibit A. of that total number, 16 were men (14 exempt employees, 2 non-exempt employees) and 7 were women (6 exempt employees, 1 non-exempt employee). The first piece of statistical evidence utilized by plaintiffs is Dr. Rosen's analysis which concluded that the RIF was not gender neutral. Dr. Rosen only examined the entire exempt workforce at Bicron, leaving out of his calculations nonexempt employees or employees who opted for retirement, but were included in the overall RIP numbers. The second piece of statistical evidence used by plaintiffs is a chart prepared by Nowac. This chart only compares the male to female exempt employee headcount at Bicron before and after the RIP, see Plaintiffs Exhibit 7.5, and further lists a total of 113 exempt male employees at Bicron prior to the RIP and 104 exempt males after the RIP, a difference of 9 exempt employees which reflects a RIP of 8% exempt males. Nowac's chart also listed Bicron as having 19 exempt females prior to the RIP and 13 following the RIF, a difference of 6 exempt females which reflects a RIF of 32% exempt females. The obvious difference in the numbers between the two groups is because Nowac's chart, in the post-RIP headcount, did not account for nonexempt (or hourly, non-salaried) employees and employees who opted for retirement, but were still included in the overall RIF calculations by Bicron. Nowac's post-RIP headcount, apart from duplicating Dr. Rosen's failure to consider non-exempt/retired employees in the calculations concerning disproportionate impact of the RIF, is also suspect because using her own calculation of 9 males in the RIP, and comparing the number of retired/hourly males (of whom there are 5 total) to Nowac's chart, she has not accounted for two male employees (16 total males RIF'd, minus 9 males identified by Nowac in her chart as exempt employees having been RIF'd, equals a difference of 7 males to be accounted for by Nowac's calculations; yet, of the 16 total males involved in the RIP, only 5 were part of the retired/non-exempt employee group as shown in Defendants' Exhibit A. Thus, 7 minus 5 equals 2). Nowac replicated her charting of exempt male-to-female analysis in the areas of salaries, haypoints and bonuses.
While these statistics are sufficient to establish a prima facie case of discrimination in termination matters, we do not find that they provide an adequate response to the defendants explanations for the RIF because it cannot be shown that gender discrimination played a role in the particular decision to discharge each of the plaintiffs. See Barnes v. GenCorp, Inc.
(6th Cir., 1990), 896 F.2d 1457, 1468-1469. The lack of an animus of sex discrimination in the termination of these two plaintiffs is no more evident than the decision to dismiss Quackenbush, (the Bicron General Manager who made the ultimate decision on who would be terminated) from the case before the issue of gender discrimination was given to the jury for its determination. The effect of dismissing Quackenbush was to effectively proclaim that the decision to ultimately terminate any of the RIF'd employees, a decision which rested with Quackenbush alone, was gender neutral. Accordingly, the trial court erred in: (1) not granting a directed verdict on the termination-based claims of gender discrimination at the same time it dismissed Quackenbush; and, (2) not rectifying the error by granting the motion for JNOV.
The first assignment is affirmed.
 II APPELLANT WAS ENTITLED TO A DIRECTED VERDICT OR A JNOV ON THE DISCRIMINATORY PAY CLAIMS OF NOWAC, GLINER, JOINER AND DELUGA.
Plaintiffs' Complaint alleged sex discrimination on a number of grounds pursuant to the Ohio Civil Rights Act, in general, and R.C. 4112, et seq., in particular. The wage-based claims of gender discrimination brought pursuant to R.C. 4112, et seq., are equivalent to discrimination wage-based claims made pursuant to29 U.S.C. § 206. These pay-based claims are specifically covered by R.C. 4111.17, Ohio's Equal Pay Act, which states in pertinent part the following:
 4111.17 WAGE DISCRIMINATION; EXCEPTIONS; ENFORCEMENT
 (A) No employer, including the state and political subdivisions thereof, shall discriminate in the payment of wages on the basis of race, color, religion, sex, age, national origin, or ancestry by paying wages to any employee at a rate less than the rate at which he pays wages to another employee for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar conditions.
 (B) Nothing in this section prohibits an employer from paying wages to one employee at a rate different from that at which he pays another employee for the performance of equal work under similar conditions on jobs requiring equal skill, effort, and responsibility, when the payment is made pursuant to any of the following:
(1) A seniority system;
(2) A merit system;
 (3) A system which measures earnings by the quantity or quality of production;
 (4) A wage rate differential determined by any factor other than race, color, religion, sex, age, national origin, or ancestry. (Italicization added.)
It has been determined that claims brought pursuant to R.C. 4112, et seq. and 4111.17 are subject to the same standards as are applied to claims brought under its Federal Equal Pay Act counterpart, 29 U.S.C. § 206. See Bielawsk1 v. AMI, Inc.(N.D. Ohio, 1994), 870 F. Supp. 771; Creech v. Ohio Cas. Ins. Co.(S.D. Ohio, 1996), 944 F. Supp. 1347. To make a prima facie showing that an employer has impermissibly violated equal pay provisions, based upon in this case the female sex of an employee, plaintiff must establish that the employer-defendant: (1) paid different wages to male employees for equal work on jobs; (2) the performance of those jobs required equal skill, effort and responsibility; and, (3) those jobs were performed under similar working conditions. See Creech, 944 F. Supp. at 1353; Bielawski,870 F. Supp. at 775. The wage-claim discrimination test above has been applied by this appellate court to a case involving wage claims based on age discrimination pursuant to R.C. 4111.17. SeeStone v. Greater Cleveland Regional Transit Auth.(Cuyahoga, 1993), 92 Ohio App.3d 373, 379, motion to certify overruled in (1994), 69 Ohio St.3d 1449. We see no reason why this test should not apply to sex discrimination based wage claims brought, or argued, under either R.C. 4111.17 or 4112, et seq.
In applying the prima facie test we note that the term "equal work" does not mean that the comparable jobs be identical; instead, the term reflects a less rigorous approach, to whether it is demonstrated that the jobs bear substantial equality in the levels of skill, effort, responsibility and working conditions.Odomes v. Nucare(6th Cir., 1981), 653 F.2d 246, 250. Also, in determining whether the work of one employee under review is substantially similar to that of the other employee being reviewed, the determination is "resolved by an overall comparison of the work, not its individual segments." Id.
Equal pay claims premised on impermissible discriminatory motives are subject to the same three-part burden shifting procedure as employed in other sex discrimination cases. SeeCorning Glass Works v. Brennan(1974), 417 U.S. 188. First, plaintiff must establish a prima facie case of discrimination. Second, the burden then shifts to the defense to demonstrate a legitimate non-discriminatory reason for the pay disparity. In the case of wage disparity pursuant to 29 U.S.C. § 206, which mimics the Ohio Equal Pay Act, the employers non-discriminatory reasons may be a seniority system, a merit system, a system which measures earnings by the quantity or quality of production, or any non-sex related factor. See 29 U.S.C. § 206(d)(1). Once the employer posits non-discriminatory reasons for the disparity, the burden then shifts back to the plaintiff to establish that the reasons advanced by the employer are a pretext for discrimination. Thus, in order for Bicron to prevail on its motion for directed verdict, the court, after viewing the evidence in a light most favorable to the non-moving party, reasonable minds could come to no other conclusion than that the reasons offered by Bicron for the pay disparity were non-discriminatory. See Civ.R. 50(A)(4). Because a motion for directed verdict tests the legal sufficiency of the evidence, which is a question of law, our review of the trial court's ruling is de novo. Howell v. Dayton Power Light Co.(1995),102 Ohio App.3d 6, 13. Our review will detail, in turn, each plaintiff.
 A. Gliner
The evidence established that Gliner was hired at Bicron in 1990 and her duties principally consisted of engineering design work on the Gamma Camera product line. Her mechanical engineering degree was obtained from Cleveland State University in 1982. Her salary in 1990 was $28,000 and was $38,400 at the time of the 1995 RIF. Her duties at the time of the RIF included design work on the Gamma Camera line and assisting customers of that product.
Gliner's counterpart, Mr. Herr, was hired by Bicron in early 1995. His aerospace engineering degree was obtained in 1989 from the University of Michigan. Prior to Bicron, he worked at Lockheed Corporation in Houston, Texas, performing design work on space shuttle components where he was paid $41,000 annually (including overtime of $2,000). His starting pay at Bicron and his pay at the time of the RIF, which did not include a one-time $2,600 payment for relocation compensation, was $45,000. This $4,000 increase in salary from Lockheed to Bicron was explained by Bicron management as being Herr's salary demand at his employment interview and the price Bicron had to pay to obtain Herr's services which included experience in three-dimensional computerized modeling. Herr's job at Bicron prior to the RIF was to utilize his skills in documentation to collect data from Bicron's various departments, not just engineering, and load this data into the computer so as to improve the engineering department's documentation capability; these duties by Herr were foreign to Gliner's job skills and duties. Herr's duties also included assisting in design/manufacturing/production decisions, and upgrading the engineering department's three-dimensional computerized modeling capability, which were also different duties, in large part, from Gliner's duties. Gliner and Herr shared a common haypoint number.
Although Gliner and Herr had a disparity in wages and performed under similar working conditions, reasonable minds cannot conclude that Gliner established a prima facie case of wage-based discrimination premised on gender in that Herr and she did not perform equal work on jobs requiring equal skill, effort and responsibility. Also, Bicron took steps to increase Gliner's pay toward levels more in keeping with industry standards for production engineers when Bicron's management (Ms. Lashchuk and Mr. Scott) was first made aware of her low pay in 1991-1992. In fact, when she first complained to management concerning her pay, she did not link her low pay as an engineer to gender discrimination and did not provide a target salary figure she believed she should be paid at. The pay disparity between Gliner and Herr was established to be based on legitimate non-discriminatory animus and the evidence of plaintiff did not establish that the legitimate non-sex related reasons for the disparity were a pretext. Accordingly, the trial court erred in not granting a directed verdict to St. Gobain on the pay claim of Gliner.
 B. Nowac
The evidence established that Nowac received her accounting degree from John Carroll University in 1980 and performed accounting jobs at several enterprises until being hired at Bicron in 1988 in the accounting department at an annual salary of $25,000. This starting salary figure is the figure that Nowac had requested during her job interview. Several subsequent promotions after hiring boosted her salary and her job duties and responsibilities in the accounting department. Her annual salary was $40,767 in 1992, $43,621 in 1993, $46,236 in 1994, and $47,998 in 1995.
Nowac's male counterpart, Mr. Willing, came to Bicron in 1992 in a lateral transfer from a St. Gobain affiliate located in the State of Delaware. Prior to leaving the Delaware job, Willing was paid an annual salary of approximately $43,000. His annual salary in 1992, upon coming to Bicron, was $47,160 (which included a $2,000 relocation expense compensation and an automatic pay increase pursuant to company policy for lateral moves between affiliates), $49,524 in 1993, $51,504 in 1994, and $53,568 in 1995. The difference in salary between the Delaware job and the Bicron job was explained as the price that had to be paid to induce Willing, whose skills and experience were coveted by Bicron management, to come to Bicron from Delaware. Comparing salary history for the three years they worked together at Bicron, Nowac's pay increased 18% during that period while Willings pay increased 15.5%; this percentage increase is in keeping with Bicron's efforts to increase Nowac's salary over time subsequent to the efforts of her supervisor to achieve greater pay for Nowac, and was greater than the yearly maximum of 5% annual pay raises normally authorized to employees by Bicron. Willing shared the same haypoint number (464) and job title (Accounting Manager) as Nowac. Nowac admitted that the salaries for both she and Willing were within the range of salaries available for the haypoint band they were assigned.
In comparing her pay inequity with only one comparable male subject (Willing), Nowac has not established that gender discrimination by Bicron or St. Gobain was the cause. This is so because the employers discriminatory action must be viewed in relation to the more-favored group because it is plaintiffs' burden under Burdine, supra, to demonstrate that similarly situated persons were treated differently. See Simpson v. KayJewelers, Div. of Sterling, Inc.(10th Cir., 1998), 142 F.3d 639,645-646 (the case applies age discrimination law, but would seem to be applicable to gender discrimination cases with little modification). As stated in Simpson, at 646, to permit a person, a female in the case sub judice, to establish gender discrimination in the payment of wages by singling out one male counterpart of the more-favored group, ". . . would be to permit the inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably." The evidence offered by Bicron demonstrated several examples where male employees with the same job positions were underpaid in relation to one another based on their haypoint numbers. This refutes the belief of Nowac that her pay disparity with Willing was motivated by gender discrimination.
The lack of gender discrimination motivation was also demonstrated by the fact that Bicron had to meet or exceed Willings salary demand in 1992 to obtain his services from Delaware.
In fact, even though Willing was paid more than Nowac, such fact does not automatically rise to the level of discrimination because employers may legitimately pay one employee more than another even though the higher paid individual maintains a lower job position than the other, higher positioned, employee. This practice is known as "red circling." See Corning Glass Works v.Brennan(1974), 417 U.S. 188; Gosa v. Bryce Hospital(11th Cir., 1986), 780 F.2d 917, 918; Bence v. Detroit Health Corp.(6th Cir., 1983), 712 F.2d 1024, 1029-1030. If such a situation can exist for employees with unequal job positions, it would seem to follow that the practice could apply to employees with the same job position.
Finally, Nowac, as a means of explaining why her pay was being kept lower than Willings, makes note of certain alleged remarks by employees that Bicron management was an "old boys club" that acted to prevent the promotion of females into management positions. These isolated stray remarks, if they were made, were not made by anyone with authority over Nowac or her salary. As stray remarks by persons without authority over the subject person, they cannot form the basis for discrimination. Merrck v. Farmers Ins. Group
(9th Cir., 1990), 892 F.2d 1434, 1438.
In summary, the trial court erred in not granting a directed verdict on Nowac's pay claim because reasonable minds, viewing the evidence in a light most favorable to her, could only conclude that her pay disparity was not motivated by gender discrimination, but by legitimate and permissible business reasons.
 C. Joiner
The evidence reflects that Joiner was hired by Bicron as an hourly employee in 1984 making less than $6.00 per hour. Her work experience prior to Bicron consisted of secretarial/receptionist with some general accounting. Thereafter, she was promoted to a salaried position entering sales orders into a computer in the sales department in 1990 and was paid a salary of $20,592. She was promoted to the newly created position of Traffic Manager in 1993 and was paid $30,000 annually. In early 1995 her salary was increased to $34,000. In the roughly ten years that she worked at Bicron, from 1984 to the 1995 RIF, her salary increased approximately 300%.
Joiner's male counterpart, Mr. Hayhurst, had been employed by Bicron since 1979. In that same ten-year period, his salary increased approximately 80%, from $18,700 to $33,767.50. Hayhurst, an hourly employee at Bicron (hence no haypoint number) had over twenty-five years of work experience in the industrial shipping and receiving.
Joiner makes two arguments supporting her pay-based discrimination claim. First, she argues that for a period of time prior to her increase in pay in late 1994 to early 1995, which cured the inequity, she was paid less than her subordinate (Hayhurst) solely because of her gender. The sufficiency of the evidence does not support this assertion. Hayhurst's pay was more a factor of his far greater length of service with the company than Joiner, which greater service necessarily accrued more periodic pay raises than hers during her briefer tenure with the company. Furthermore, as stated earlier in the analysis of Nowac's pay claim, Bicron demonstrated seven instances where male subordinates were paid more than their male superiors and that these examples accounted for the difference in pay based on the subordinates' greater length of service with the company.
Joiner's second argument is based on Joiner's belief that she was paid below the minimum salary available for a Traffic Manager with a haypoint number of 366 when she took that position and that she continued to be paid below the minimum available salary thereafter based on a haypoint number of 366. Joiner's sole reliance on a haypoint number of 366 is premised on her seeing a list during pretrial discovery of Bicron salaried employees from August, 1994 to June, 1995, which identified her haypoint as 366, but which had been corrected in the margin to reflect the number 268. See Plaintiffs' Exhibit 124. In addition to the correction to Joiner's data, this exhibit also had corrections for a number of other employees data (including males), including haypoints which were lowered in some cases and raised in others. From this list, Joiner inferred that Bicron had altered the company records by lowering her haypoint number to justify her salary and cover up the gender discrimination in the alleged pay disparity. It was admitted by Joiner that she was told by her supervisor in October of 1994 that her haypoint was 268. Joiner also admitted that if her haypoint number was 268, then her salary was within the range available for that haypoint banding level. The simple fact is that the sufficiency of the evidence does not support that Joiner's haypoint number was anything but 268. The corrected list relied upon by Joiner proves no causal connection between pay and discrimination based on sex because male employees on the list also had their haypoint data corrected similarly to Joiner's. If male and female employees on the list had similar corrective action performed on their data, no reasonable fact-finder could conclude that the corrective action was motivated by sex. Absent a causal connection between the factor under consideration and sex, sexual discrimination is not demonstrated. See Lindale v. Tokheim Corp.
(7th Cir., 1998), 145 F.3d 953, 957.
Accordingly, the trial court erred in not granting a directed verdict on Joiner's pay claim because reasonable minds, viewing the evidence in a light most favorable to her, could only conclude that her pay disparity was not motivated by gender discrimination, but by legitimate and permissible business reasons.
 D. Deluga
Deluga began work at Bicron in 1988 as an hourly employee as a cost accountant at a salary of $15,000, which was an increase of $1,000 from her previous job as a part-time sales clerk at a sporting goods store. In her job interview with Bicron she did not ask for a specific salary figure; instead, she asked that her salary be competitive and she was offered $15,000, which she accepted. Her accounting experience had spanned ten years prior to starting at Bicron and she had received her Bachelors degree in Business Administration in 1988 shortly before starting at Bicron. In 1989 Deluga earned $16,557. In January of 1992, in response to complaints to Nowac about Deluga's pay in relation to Weaver's, Bicron converted Deluga to a salaried position and increased her pay to $27,000 (a 31% increase). In July of 1992 Bicron made the unusual decision (it was unusual for the company to give two pay increases in any one year to a given employee) to increase her salary to $30,000 (an increase of 11%) Sometime in 1992, presumably in June of that year which occasioned her second pay increase in 1992, Deluga received her MBA degree from Lake Erie College. Deluga's annual salary at the time of the 1995 RIF was $35,064.
One of Deluga's male counterparts, Mr. Weaver, who had a Bachelors degree, was hired by Bicron as a cost accountant in 1989 at an annual salary of $31,000. He was paid $30,000 in the accounting job he had held prior to coming to Bicron and, unlike Deluga, had many years of cost-accounting experience. In 1992 his salary had increased to $37,500. He left Bicron in February of 1995.
Deluga's other male counterpart, Mr. Luther, was a cost accountant with twenty-seven years of work service with the company in the areas of cost accounting, economic management and financial reporting. He had received his Bachelors degree in accounting/finance in 1985. In the 1970's his annual salary at the company was approximately $15,000. In 1995 his annual salary was approximately $45,000 to $46,000.
There is no question that the salaries of these three individuals (Deluga, Weaver and Luther) was within the range of salaries available for the particular haypoint range for, these positions. Also, like the pay claims of the other plaintiffs, Deluga cannot reasonably demonstrate that her pay disparity was the result of gender discrimination. Bicron paid her what she was willing to accept when she started working at the company. Later, when Weaver came on board and she complained of the pay disparity to Nowac, Deluga received a 31% increase in salary followed by an additional 11% increase six months later. After 1992, Deluga did not complain about her rate of pay until after commencing this lawsuit. Apparently she felt satisfied with her pay between 1992 and the 1995 RIF. While Weaver's starting salary appears unduly large in relation to Deluga's salary, it must be remembered that Weaver had many years of cost accounting work experience prior to coming to Bicron which Deluga did not possess. Also, the disparity in starting salaries between Deluga and Weaver, which carried over to subsequent years despite the customary annual increases in pay to employees in general, is more a factor of the company paying Weaver $1,000 more than he had been earning in his prior position to induce him to work at Bicron.
The disparity of pay between Deluga and Mr. Luther enjoys a similar fate. A reasonable person would view the disparity as a product of Luther's long tenure with the company and the annual increases in pay given to employees in general over that service period. The mere fact that Deluga's salary did not catch up to Luther's, or Weaver's, over time is not, in and of itself, evidence of discrimination; more evidence than the passage of time is required. Lindale, supra at 958. These legitimate reasons for the disparity in pay when comparing Luther and Weaver to Deluga was not rebutted by the plaintiffs.
Accordingly, the trial court erred in not granting a directed verdict on Deluga's pay claim because reasonable minds, viewing the evidence in a light most favorable to her, could only conclude that her pay disparity was not motivated by gender discrimination, but by legitimate and permissible business reasons.
The second assignment of error is affirmed.
 IV
APPELLANT IS ENTITLED TO A NEW TRIAL.
Having reversed the verdict through the previous assignments, this assignment is moot and need not be discussed. See App.R. 12(A)(1)(c).
Judgment reversed.
This cause is reversed.
[1] The court granted a directed verdict in favor of co-defendant Mr. Carr Lane Quackenbush, the General Manager of St. Gobain's Bicron facilities. It was Mr. Quackenbush who ordered the reduction in force and who was sued as an individual by plaintiffs pursuant to R.C. 4112.01 et seq.
[2] Bicron also had a plant in Solon, Ohio, which was part of the RIF. The Newbury and Solon operations, which were unprofitable while run by their prior owners due to excessive operating expenses, were acquired by St. Gobain in 1990. In early 1991 St. Gobain brought in a new management team to reorganize and manage these acquisitions and their inherited workforce. Bicron manufactures crystals for use in imaging equipment, such as magnetic imaging resonance machines used in diagnosing illnesses in people, metal detectors used at airports, and radiation detectors. (R. 50, 85, 132.)
[3] Dr. Battisti stated that Gliner's job required her to travel to overnight destinations approximately four times per year. (R. 179.)
[4] This apparently serves to diminish value attributed to seniority and experience within each category as between members of that category. For example, Dr. Rosen admits that a Bicron employee with one day of service at the company is treated no differently than an employee with ten years of service in his analysis. (See R. 364-365.)
[5] Attorney Cohn withdrew from representation of the plaintiffs prior to the filing of the lawsuit when he moved to Columbus, Ohio.
[6] The General Manager reported to St. Gobain.
[7] Each position at Bicron had a haypoint number associated with it. The haypoint number is based on a number of individual factors which are graded within a certain range for each factor. The principle behind the haypoint system is to achieve an equal pay scale across the company.
[8] Mr. Parkhurst has a Bachelors degree in physics and some MBA graduate work.
[9] Mr. Brown, whose annual salary was $76,740, was part of the Management Incentive Program at the time of his termination in the RIP. (R. 584.)
[10] The Traffic Manager was responsible to manage and oversee the shipping costs of the company's products and keep those shipping costs to a minimum. (R. 656.)
[11] The witness assumed that a portion of the $47,160 paid to Willing that year reflected a one time relocation compensation by Bicron, placing his assumed base salary at approximately $45,000 when he was hired. (R. 1187.)
[12] When the auditors arrived, she and her group were unprepared. Later, the witness found in her mail a letter, authored by Mikolic approximately six to eight weeks prior to the audit, notifying her in advance of the upcoming audit. (R. 1197.) The witness complained that she had not been notified in person in advance of the impending audit.
[13] Quackenbush noted that prior to St. Gobain acquiring Bicron, the Newbury based corporation and the Solon based corporation had been fierce competitors with overlapping product lines and the two operations hated one another. (R. 1384.)
[14] Defense counsel proved the witnesses' point when, during cross-examination, he posited that Joiner did effect savings in the shipping department of over $100,000 in 1994, but had only effected shipping savings of approximately $25,000 in 1995 by the time of the August 15, 1995, RIF. (R. 1843.)
[15] The court's use of the term "dismissed" with reference to Quackenbush is a misnomer. Involuntary dismissals under Civ.R.41 (B) are only provided in non-jury cases. Thus, the court's "dismissal" of Quackenbush had to be through the granting of the directed verdict motion.
[16] Discretionary appeal allowed by the Ohio Supreme Court on December 23, 1998. 1998 Ohio LEXIS 3790. See Ohio Supreme Court case number 98-1927.
It is, therefore, considered that said appellant(s) recover of said appellee(s) its costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Exceptions.
 JOHN T. PATTON, P.J., and LEO M. SPELLACY, J. CONCUR.
 ____________________________________ JAMES D. SWEENEY, JUDGE